## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,    :

    v.    :

ANDREW MOGILYANSKY,    :    **Dkt. No. 2:08-cr-00711-MAM-1**

    Defendant.    :

## DEFENDANT'S SENTENCING MEMORANDUM

The defendant, Andrew Mogilyansky, will come before this Court on September 16, 2009, at 9:30 a.m., for sentencing, following his conviction after pleading guilty pursuant to Fed.R.Crim.P. 11(c)(1)(C) and a written plea agreement to a four-count indictment. Count One charged that between December 1, 2003, and January 31, 2004, Andrew Mogilyansky traveled to Russia with intent to engage in illicit sexual conduct in violation of 18 U.S.C. § 2423(b). Counts Two through Four each charged Mr. Mogilyansky with engaging in illicit sexual conduct during the travel charged in Count One, in violation of *id.* § 2423(c). This Court accepted Mr. Mogilyansky's guilty plea on July 30, 2009. Pursuant to Rule 11(c)(4), the Court must now impose a sentence between 78 and 97 months. In light of the other sentencing factors this Court must consider pursuant to 18 U.S.C. § 3553(a), we believe that a sentence of 78 months is sufficient, but not greater than necessary, to meet the goals of sentencing listed in *id.* § 3553(a)(2), for the reasons more fully set forth in this Memorandum.

As this Court is well aware, after *United States v. Booker,* 543 U.S. 220 (2005), a district court's mandate is to "impose a sentence sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), to comply with the purposes of section 3553(a)(2). See *United States v. Levinson,* 543 F.3d 190, 201 n.8 (3d Cir. 2008) (referring to the quoted language as a "requirement"). Those purposes are promotion of respect for law, including the provision of *just* punishment in light of the seriousness of the offense; deterrence, both general and specific; incapacitation to protect the public; and provision to the defendant of "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).

To determine the minimally sufficient sentence to meet the goals of sentencing, 18 U.S.C. § 3553(a) requires this Court to "consider" seven factors: the "nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1), "the purposes of sentencing themselves," *id.* § 3553(a)(2), "the kinds of sentences available," *id.* § 3553(a)(3), "the sentencing range recommended by the sentencing guidelines," *id.* § 3553(a)(4), "the policy statements issued by the Sentencing Commission," *id.* § 3553(a)(5), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," *id.* § 3553(a)(6), and "the need to provide restitution to any victims of the offense." *Id.* § 3553(a)(7).

For the reasons explained in this memorandum, a sentence of 78 months is sufficient, but not greater than necessary to meet the goals of sentencing.

A.    **Andrew Mogilyansky and His Offense**

In many ways, Andrew Mogilyansky's life is an American success story. After fleeing what was then the Soviet Union to escape ethnic persecution, Mr. Mogilyansky not only established a family and successful business in this country, he devoted his substantial intellect, resources, and energy to spearhead an international effort to assist victims of international terrorism in his former homeland.

Andrew Mogilyansky was born in 1970, the only child of Alexander and Eugenia Mogilyansky. *PSR ¶ 58*. His father was employed in the marketing field; his mother was a math professor. *PSR ¶ 59.* Andrew's parents divorced when he was two years old. *PSR ¶ 58*. From an early age, Andrew showed much promise:

> When he was just 10 years old, he astonished me with three different ways to prove the Einstein Theory of Relativity. At that time, I was a professional in the field of computer science, mathematics and physics. However, his explanation was very difficult for me to grasp and fully understand.
>
> At the age of 16, when he was still in high school, he wrote a scientific article in theoretical physics. This article was published not only in the former USSR, but also in the USA and other countries.

*Exhibit D-1.2 – Letter to Court from Alexander Mogilyansky.*

Despite young Andrew's promise, life was not easy for him due to the anti-Semitism that prevailed in the Soviet Union at that time. Andrew and his father were fortunate to be able to immigrate to the United States in 1988-1989; his mother remained in Russia. *PSR ¶ 61.* The year they arrived in the United States, Andrew was accepted as a student at Columbia University in

New York. According to his father, Columbia accepted him solely on the basis of the article he wrote on theoretical physics when he was 16 which had been published in the United States, the Soviet Union, as well as other countries. *Exhibit D-1.2 – Letter to Court from Alexander Mogilyansky.*

Andrew thrived at Columbia University. According to his father:

Andrew participated in and won numerous competitions in mathematics and physics not only in Leningrad and the USSR, but also in the USA. One of his highest achievements in this field was to win a prestigious Putnam Award (national math competition among college students) in 1990. When he graduated in 1994, he was named the best math student of Columbia University.

*Id.* Much to his father's dismay, Andrew did not pursue a career in science. Instead, he decided to go into business. *Id.*

In 1993, while he was still a student at Columbia, and two years after the dissolution of the Soviet Union, Mr. Mogilyansky returned to what had become the countries of Russia and Ukraine. Although Mr. Mogilyansky left the Soviet Union because of persecution, he "never cut off [his] ties to friends and family members who stayed behind, and [he] never stopped loving Russian culture and people." *Exhibit A – Letter from Andrew Mogilyansky.* While the main purpose of his trip was business (he was working for a company called Continental Enterprises which was engaged in trade with Ukraine), he took the opportunity to visit friends and family (including his mother) on that trip.

The year after he graduated from Columbia, Mr. Mogilyansky started a business called IFEX Global,[1] which sold unique impulse fire extinguishing equipment. *PSR ¶¶ 12 and 77, Exhibit A – Letter from Andrew Mogilyansky.* Because company did business in Russia and Ukraine, Mr. Mogilyansky traveled there regularly. *Exhibit A – Letter from Andrew Mogilyansky.* In 1997, when he was returning to the United States from one of these trips, he met Oksana Gluschuk at the airport in Paris while waiting to board the same plane to New York. They arranged to change seats so they could sit together during the flight, and they have been together ever since. They were married in 2002, and now have three children, Daniel and Anna, fraternal twins, age two, and Julia, age one. *PSR ¶ 63, Exhibit A – Letter from Andrew Mogilyansky, Exhibit D-1.1 – Letter from Oksana Mogilyansky.*

While Mr. Mogilyansky's primary focus during this time was his wife and business, he was also becoming concerned with the increasing frequency of terrorist attacks in Russia. *Exhibit A – Letter from Andrew Mogilyansky.* When terrorists attacked the Nord-Ost Theater in Moscow in 2002,[2] resulting in 130 deaths and many more injuries, he resolved to do something about it. *Id.* Together with his wife, Oksana, and several friends, Andrew formed the

---

[1] IFEX is an acronym for the Impulse Fire Extinguishing System, which "is a series of firefighting equipment that uses small amounts of water fired in high velocity bursts to put out fires. ... Water droplets are shot in vaporous bursts that can travel up to 120 meters per second, causing a strong cooling effect that is responsible for much of this system's success." http://en.wikipedia.org/wiki/Impulse_Fire_Extinguishing_System#cite_note-0#cite_note-0.

[2] *See* http://en.wikipedia.org/wiki/Moscow_theater_hostage_crisis.

International Foundation for Terror Act Victims[3]. See *Exhibit C-1 – Summary of Foundation's activities, Exhibit C-2 – 501(c)(3) public charity status letter from the IRS.* His efforts resulted in over $30,000 being raised to provide assistance to the victims of that attack.[4] The Russian government later expressed its gratitude to Mr. Mogilyansky in a letter to him from the Russian Ambassador to the United States, a copy of which is included (along with an English translation) as *Exhibit C-8.1* to this sentencing memorandum.

But Mr. Mogilyansky was interested in more than providing financial and medical assistance to the victims of this attack – he wanted to help them seek justice for the death of their loved ones. As Mr. Mogilyansky explains in his letter to the Court:

> In the aftermath of the Nord-Ost "rescue" operation," Russian government officials including Mr. Putin tried to deny their responsibility for the deaths of nearly 130 victims who succumbed to the poison by claiming that the gas was harmless, and that the hostages died of other causes such as stress and organ failure, purportedly unrelated to the gas. To help victim families, I researched the issue and then provided them with solid scientific proof that when the Russian government used the gas, it knew, with mathematical certainty, that about 10% of the hostages would die as a result.
>
> The documents and research I uncovered and translated are now being used by victim families as key evidence in their case against the Russian government, which is currently pending in the European Court of Human Rights in Strassbourg.

*Exhibit A – Letter from Andrew Mogilyansky.*

---

[3] *See* http://www.moscowhelp.org.

[4] *See* http://www.moscowhelp.org.

By the end of 2002, Andrew Mogilyansky seemed to be doing all the right things. Not only was he happily married and a successful businessman, he was providing significant assistance to victims of terror in the native land.

Although Andrew Mogilyansky did not realize it at the time, he was also slowly, but surely, sowing the seeds of his own undoing. Beginning in the early 2000s, Andrew Mogilyansky began to view his trips to Russia as a time when he could cheat on his wife. Mr. Mogilyansky put it this way in his letter to the Court:

> Although my visits to Russia were always primarily for business purposes and to see family and friends, I am embarrassed to say that by the early 2000s, I began to also view them as a time when I could cheat on my wife without negative repercussions. I loved Oksana very much and considered myself happily married, and would never have cheated on her when I was in the United States. However, I started to look at my trips to Russia as a kind of separate existence in which it would be okay to have sexual relations outside my marriage. I know this was a lame justification, and to this day I cannot believe I betrayed Oksana's trust in such a despicable way. I am deeply ashamed that I allowed the gratification of the moment to prevent me from any objective reflection on my conduct.

*Exhibit A – Letter from Andrew Mogilyansky.* Mr. Mogilyansky pursued his unfaithfulness through "escort" services. At first, the women sent to him were clearly over 18 years of age. But when one escort service provided younger "escorts," Mr. Mogilyansky unfortunately did not question it. *Id.* He did not think about how his conduct might be harming the young teens, which he thought of only as "professional 'escorts.'" Andrew Mogilyansky's behavior is simply another example of how good people can do bad things.

Thankfully, Andrew Mogilyansky's illegal and immoral behavior did not continue after he committed the offenses for which he must now be sentenced. In 2004, after his computer was seized on his return to Philadelphia from that trip, he confessed his unfaithfulness to his wife and resolved to "live my life in a way that benefits others in every way I could." *Id.* See also *Exhibit D-1.1 – Letter from Oksana Mogilyansky.*

In September 2004, when Chechen terrorists seized a middle school in the small Russian town of Beslan and took over 1,100 hostages, including 777 children,[5] Andrew Mogilyansky wanted to help in any way he could. After Russian forces stormed the building to free the hostages, at least 334 hostages were killed, including 186 children. *Id.* Hundreds more were wounded. *Id.* Andrew Mogilyansky immediately set to work mobilizing an international effort to provide aid to the victims. *Exhibit C-1 – Summary of Foundation's activities, Exhibit C-7 – List of Beslan terror attack victims who received aid from the Foundation.* In his letter to the Court, he writes:

> Even though the Foundation was operated by a team of amateur volunteers and spent no donor funds on salaries, travel, or other overhead (most volunteers, including my wife and me, paid for these expenses out of their own pockets, and had jobs or businesses which covered their living expenses), we raised over $1.2 million from over 8,000 donors in 52 countries to aid the Beslan victims. This was far more than any other charity in the world raised for Beslan.
>
> More importantly, the Foundation distributed aid to victims promptly and fairly, with emergency assistance reaching families of injured children when it was mostly needed: in September 2004,

---

[5] *See* http://en.wikipedia.org/wiki/Beslan_school_hostage_crisis.

not many months later. In the days and weeks immediately following the attack, teachers from a music school in Beslan who volunteered for the Foundation, went literally bed-to-bed through Beslan hospitals, handing out much-needed emergency funds. This money was used by parents to buy food and medication, to move children to specialized facilities in neighboring towns, and to cover other urgent expenses. Ultimately, my charity helped provide emergency care for hundreds of injured children, possibly accelerating their recovery and improving their long-term condition, and likely saving many lives. I am proud of having inspired more than 50 volunteers and 8,000 donors worldwide to participate in this effort.

In addition to providing financial assistance, the Foundation I ran was able to bring a number of injured children to the USA for complicated surgeries which could not be done in Russia. This was accomplished using virtually no donor funds for medical procedures or housing. All medical services were provided pro bono, and donated Delta SkyMiles were used to pay for their air travel. With the exception of Diana Murtazova whose family had to stay in the US for 6 months, all other injured children and their parents were housed at donors' homes throughout the stay in our country, at no cost to the Foundation.

*Exhibit A – Letter from Andrew Mogilyansky.*

Michael Ratner, the vice president of the International Foundation for Terror Act Victims, describes Mr. Mogilyansky's efforts on behalf of these victims of terrorism:

He called me and several other people immediately after the news of that horrible terrorist attack came out, told us that he wanted to organize a campaign of helping children-victims of that massacre and asked us to join him in that work. The first 72 hours after the incident were critical and I honestly do not believe that Andrew had a minute of sleep in that entire period. He recruited volunteers, organized a complete re-write of the Foundation's website to reflect the new campaign, established the structure in Russia that would help gather information about the victims and distribute aid, managed the press-releases and reached out to many potential donors for help. The level of selfless dedication that he demonstrated in putting together that effort was absolutely extraordinary. Andrew provided the governing principles for the Foundation, including complete transparency over donations and

their distribution, and his insistence that none of the donations designated for the victims were to be used for any administrative expenses. Under his guidance the Foundation eventually collected over $1.2 million dollars (more than the Red Cross) from more than 8,000 donors and distributed aid to families of over 300 children-victims. In addition to monetary assistance Andrew was very keen to ensure that children who needed complex medical care of the kind that was not available in Russia would have an opportunity to receive such care abroad. He facilitated visits of several such children to the US, helped organize their treatment and even hosted some of them in his house.

Exhibit D-3.1 – Letter from Michael Ratner. See also the following letters from

U.S. and Russia-based Foundation volunteers: Exhibit D-3.2 – Letter from Ella

Bitarova, a school teacher who lost a sister in Beslan, and who became the

Foundation's "Erin Brockovich"; Exhibit D-3.3 – Letter from Zhenya Kiperman, a

Drexel University film professor who volunteered with the Foundation; Exhibit

D-3.4 – Letter from Anton Likhodedov, a trader with Deutche Bank in London

who volunteered with the Foundation; Exhibit D-3.5 – Letter from Georgiy

Vasilyev, a prominent Russian singer and song-writer. He was also a Nord-Ost

hostage, and producer of the show being presented at the time of the attack.

Once more, the Russian government expressed its thanks to Mr.

Mogilyansky for his efforts. A copy of the letter Mr. Mogilyansky received from

the Russian ambassador (along with an English translation) is included as

Exhibit C-8.2.

Andrew Mogilyansky's extraordinary work with the Foundation received

much local and international media attention. CNN referred to it as "such a

great model … grassroots effort, … such an inspiration and such a help to so

many!" (Exhibit C-4.1 – CNN Headline News 2004-09-09),. See also other

examples of TV footage in *Exhibit C-4.2 (CBS Eyewitness News)*, *Exhibit C-4.3*

*(ABC Channel 6 News)*, *Exhibit C-4.4 (WB17 News)*, *Exhibit C-4.5 (CBS*

*Eyewitness News)*. News articles are included in *Exhibit C-5.*

Many of the victims who were helped by Andrew Mogilyansky's efforts

have written letters of support to this Court. In one letter, 28 terror victims

write:

> We are forever grateful to Andrew Mogilyansky and International
> Foundation for Terror Act Victims for the help they provided us
> during that horrific time. Andrew's good deeds prove that he is one
> of the most good-hearted, compassionate and caring people. In the
> time when the whole world stood awestruck and felt sorry for the
> victims of Beslan massacre, he is one of few people that actually
> did a lot to help. And his help meant the world to us. Andrew will
> always be in our hearts and prayers.

*Exhibit D-2.1 – Letter from Beslan families.*

The father of one of the victims of the Beslan attack explains in detail the

personal efforts Andrew Mogilyansky made on behalf of his daughter:

> I am the father of Anna Kadalaeva, a girl, who became a victim of
> Beslan School Terror Act on September 1-3, 2004. She suffered a
> serious head injury, and as a result, lost her eye.
>
> In Russia, they did everything they could to help her at the time.
> However, with the help of the Foundation created by Andrew
> Mogilyansky my daughter now has an implant that allows the
> artificial eye to move. Because of this, even those who know about
> my daughter's injury cannot tell which eye is real and which is not.
> It is very important for a girl! The cost of this surgery was nothing
> near what I could afford now and especially back then.
>
> I am writing this letter, so that I can convey to you how important
> and timely the help provided by Andrew Mogilyansky was. The
> flight, surgery, accommodations, implant and leisure-time were all
> covered and well-planned in advance. In the US, everyone around
> us treated us like their own family. All of this was possible only
> thanks to Andrew, who established the Foundation and organized
> people around him. The Foundation united many people – they all

UNICEF. The name of Andrew Mogilyansky is mentioned throughout the book in victims' testimonials.

Andrew Mogilyansky's caring for others has not been limited to the work he did through his Foundation. Numerous letters from friends, family members and business associates attest to his acts of personal caring. For example, in his letter to the Court, Nikolay Ananin writes that after he arrived in the United States five years ago with only $100 in his pocket, he changed jobs 14 times within the first year and then injured himself when he fell of the roof while working a construction job. Shortly after that, he met Mr. Mogilyansky, who "became like a brother" to him and eventually was able to get him work with the Russian Yellow Pages, a business which Mr. and Mrs. Mogilyansky then headed. *Exhibit D-4.11 – Letter from Nikolay Ananin..*

Another Russian Yellow Pages employee writes:

> Despite his extremely busy lifestyle, Andrew is very caring and always goes out of his way to help when his employees or friends need help. He is the type of person that you can call whenever you are in a difficult situation. When my daughter and I got into a terrible car accident, although it was 2 a.m. at night, Andrew was first to come and help us out. Also, when my mother was in a hospital diagnosed with a serious heart disease, he was extremely understanding, and he supported my family in all possible ways during that difficult time.

> Also, when I had a newborn baby, he accommodated me with special working conditions and convenient working schedule, even though it was probably not in the company's best interest business-wise. Whenever I need his professional advice or assistance, he is always there to help. I will never forget his kindness and will be grateful to him forever.

*Exhibit D-4.14 – Letter from Irina Shulyakovsky.*

Other letters attest to Mr. Mogilyansky's caring nature.  Felix Kremer,

M.D., writes:

> Yet it was not his mental agility that really astounded me, it was
> his attitude to a sick person who had unbearable time suffering
> from depression. Andrew would spend bit of his, by now, very
> precious time with her and help relieve her misery. This person
> was my late wife and Andrew's soft humor and gentility made her
> smile.
>
> Many people know of Andrew's money-raising effort to help the
> victims of horrific terror acts, but for me it was the tranquility of
> heart and mind that he brought to my wife that meant a lot at the
> time. His warm and kind heart is what makes Andrew an
> extraordinary person.

*Exhibit D-5.6 – Letter from Felix Kremer.*

By the time Andrew Mogilyansky was arrested in December 2008, it had

already been approximately five years since he had committed this, his first

and only offense.  He had resolved to live his life in a way that helped people in

any way he could, while not harming anyone ever again.  While he has lived up

to that promise to himself, it was not until he was arrested that Mr.

Mogilyansky realized that he had not only betrayed his wife in late 2003, but

he had also violated U.S. law and harmed the young women he had only

thought of previously as "professional 'escorts.'"  Once he understood the full

impact of what he had done, Mr. Mogilyansky immediately resolved to do the

right thing.

Even though undersigned counsel advised him that he had a triable

case, he decided that he wanted to take responsibility for his actions and spare

the three young women the pain or embarrassment they would have to endure

at a trial.  He also decided that rather than fight the civil suit the three victims

- 14 -

had brought against him, he would settle it as a way to help them recover from the trauma he and other Berenika customers had caused them. The money he has agreed to pay the victims is not only a significant amount of money (especially for someone in Russia), it represents a substantial portion of Mr. and Mrs. Mogilyansky's assets. Additional information concerning the settlement will be provided to the Court at the time of sentencing.

**B.    The Kinds of Sentences Available.**

Andrew Mogilyansky has pled guilty pursuant to a plea agreement in which the parties agreed, pursuant to Fed.R.Crim.P. 11(c)(1)(C), that a sentence within the stipulated guideline range of 78-97 months is the appropriate sentence in this case. The Court accepted that guilty plea agreement on July 30, 2009, and therefore it must, as required by Rule 11(c)(4), impose a sentence within that range.

With respect to supervised release, the Court must impose a term of between five years' and lifetime supervised release. *PSR ¶ 92.*

**C.    The Guideline Range.**

The defendant agrees with the PSR that the correctly calculated sentencing guideline range is 78-97 months' imprisonment, *PSR ¶ 90,*[6]

---

[6] The PSR agreed with the guideline calculation agreed to by the parties:

| | |
|---|---|
| Base offense level (§ 2G1.3(a)(4)) | 24 |
| Offense involved a sex act (§ 2G1.3(b)(4)) | 2 |
| Grouping for multiple victims (§ 2G1.3(d)(l)) | 3 |

(continued ...)

supervised release of from five years to life, *id.* ¶ *94*, and a fine of between $12,500, and $125,000. *Id.* ¶ *100*.

D.    Policy Statements Issued by the Sentencing Commission.

The fifth factor which 18 U.S.C. § 3553(a) requires this Court to consider prior to imposing sentence is any "pertinent policy statement issued by the Sentencing Commission." *Id.* § 3553(a)(5)(A). Given Mr. Mogilyansky's extensive prior charitable works, USSG § 5H1.11 (p.s.) is pertinent to his sentencing. While the defense is not suggesting that Andrew Mogilyansky's extraordinary and selfless work assisting victims of terrorism warrants a sentence below the guideline range, it is certainly a reason to impose a sentence at the bottom of that range.

In *United States v. Sally*, 116 F.3d 76 (3rd Cir. 1997), the Court held that post-offense rehabilitation efforts may constitute a sufficient factor warranting a downward departure. Mr. Mogilyansky does not seek a downward departure in this case, but rather the lesser remedy of a sentence at the bottom of the guideline range.

The offense in this case occurred almost 6 years ago. Since then, Mr. Mogilyansky confessed his infidelity to his wife, has not reoffended, and, in part as a way to make amends, has devoted his life to helping others. In addition to Mr. Mogilyansky's extraordinary acceptance of responsibility previously

---

(... continued)

| | |
|---|---|
| Vulnerable victims (§ 3A1.1) | 2 |
| Adjusted offense level | 31 |
| Less 3 points for acceptance of responsibility (§ 3E1.1) | -3 |
| Total offense level | 28 |

- 18 -

signed by 28 people) attached to this memorandum as *Exhibits D-1 through D-*

6.

The foregoing demonstrates extraordinary post-offense rehabilitation
which in and of itself, or together with the other mitigating factors in this case,
warrants the Court's sentencing Mr. Mogilyansky at the bottom of the guideline
range.

**E.    The Need to Avoid Unwarranted Disparities.**

The sixth factor which 18 U.S.C. § 3553(a) requires this Court to
consider prior to imposing sentence is "the need to avoid unwarranted sentence
disparities among defendants with similar records who have been found guilty
of similar conduct." *Id.* § 3553(a)(6). See also *United States v. Parker*, 462 F.3d
273, 277 (3d Cir. 2006) ("We have concluded that Congress's primary goal in
enacting § 3553(a)(6) was to promote national uniformity in sentencing rather
than uniformity among co-defendants in the same case."). Any sentencing
range produced by the application of the guidelines is a rough approximation
by the Sentencing Commission of the range of sentences likely to produce a
sentence that accounts for the factors listed in 18 U.S.C. § 3553(a), including
the avoidance of unwarranted disparity. A sentence at the bottom of the
guideline range prescribed by the Commission creates no unwarranted
disparity. This is especially so because of the many mitigating factors unique to
this case.

**F.    Restitution.**

The plea agreement provides for restitution in the amount of $5,000 for each victim, for a total of $15,000.  *PSR ¶ 101.*

**G.    A Sentence of 78 Months would be Sufficient, but not Greater than Necessary, to Achieve the Purposes of Sentencing.**

After considering all of the factors listed in 18 U.S.C. § 3553(a), this Court must impose a sentence which is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." *Id.* The purposes of sentencing set forth in paragraph 2 are: *just* punishment, deterrence, protection of the public, and the treatment of the offender.

Even though 18 U.S.C. § 3553(a)(1) *requires* this Court to "consider ... the history and characteristics of the defendant," the guidelines do not, and could not, take the history and characteristics of this or any particular defendant into account.  As the Supreme Court noted in *Rita v. United States,* 127 S.Ct. 2456 (2007), although both the Sentencing Commission and sentencing judge take the § 3553(a) factors into account, the Commission does it on a "wholesale" basis, while the sentencing judge does it at the "retail" level. 127 S.Ct. at 2463.  In other words, the guidelines do not take into account the § 3553(a) factors as they apply to a particular defendant.  Several such factors in this case call for a sentence that is 78 months – the bottom of the guideline range.

- 19 -

The Court's first consideration is the need to impose a sentence that is sufficient, but not greater than necessary, "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Accomplishing that goal requires balancing the harm done by the offense with the mitigating factors particular to Andrew Mogilyansky. There is no question that the young teens with whom Andrew Mogilyansky engaged in sexual conduct were harmed by their encounter with Mr. Mogilyansky. The sentencing guidelines recommend that for a generic defendant who is responsible for the "relevant conduct" for which Andrew Mogilyansky is responsible, "just punishment" would lie somewhere between 78 and 97 months' imprisonment. The particular factors present in this case make a sentence no greater than 78 months, the low end of that range, sufficient, but not greater than necessary to meet the goals of sentencing.

There is no need for the sentence in this case to go above the bottom of the guideline range to ensure that the public is protected from Andrew Mogilyansky. In fact, if protecting the public from Mr. Mogilyansky were the only goal of sentencing, no term of imprisonment would be necessary at all. There are several reasons why this Court should conclude that Andrew Mogilyansky poses no future threat to anyone. First, even though Mr. Mogilyansky was not arrested for more than five years after he committed these offenses, he committed no additional offense in the interim. This is proof positive that Mr. Mogilyansky has no risk of recidivism. Second, according to Steven E. Samuel, Ph.D., Clinical Associate Professor in the Department of

proceedings, as well as to assist in their healing, is also a reason to impose sentence at the low end of the range.

The last two goals which the sentence must be "sufficient, but not greater than necessary" to achieve are deterrence and Andrew Mogilyansky's needs for treatment. While the deterrence factor may require a term of imprisonment, a sentence of 78 months' imprisonment would certainly be sufficient to meet that goal. That is especially so, since the Bureau of Prisons always designates defendants convicted of sexual offenses to institutions rated Low Security or higher. *See Exhibit D – Declaration of J. Michael Henderson, ¶ 2.* Even though Mr. Mogilyansky would normally be eligible to serve his term of imprisonment at a minimum security camp, *id.,* because of the nature of his offense, he will do harder time than most similar first-time offenders serving less than 10 years. *Id.* ¶¶ 3-4. Because the time he will do will be harder time, a shorter term of imprisonment should be sufficient to meet the punishment and deterrence goals in this case. A sentence greater than 78 months is not necessary to effectuate the treatment component of the sentencing guidelines, since Dr. Samuel does not believe Mr. Mogilyansky requires any treatment at all.

A sentence at the low end of the suggested guideline range is also appropriate with respect to the supervised release and fine portion of the sentence. Five years' supervised release is certainly sufficient for a man who had already stopped his criminal behavior more than five years *before* he was arrested. Given the substantial nature of the civil settlement Mr. Mogilyansky

- 22 -

has agreed to pay the victims, combined with the $15,000 restitution to which he has agreed, a fine of $12,500 is sufficient, but not greater than necessary to meet the goals of sentencing.

## CONCLUSION

The clear issue for this Court is where within the 78-97 months range this particular defendant should fall. This guideline range has already taken into consideration the relevant factors regarding the nature of the offense. The facts that there was sexual conduct with teenage girls, from an orphanage, and who were particularly vulnerable have all been factored into this 78-97 months range.

This guideline range contemplates all people who have committed similar offenses as Andrew Mogilyansky. The question then becomes where in this range the background, character, outstanding charitable work, extraordinary remorse, extraordinary post-offense rehabilitation, and tremendous minimization of the damage done to these victims place Mr. Mogilyansky.

If Mr. Mogilyansky does not deserve the low end of all those similarly situated, then it is hard to imagine any defendant who would qualify for the low end of this guideline.

For these reasons, as well as for all other reasons stated throughout this Memorandum, we ask that this Court, after considering all factors required by 18 U.S.C. § 3553(a), sentence Andrew Mogilyansky to a term of 78 months'

- 23 -

imprisonment, five years' supervised release, restitution of $15,000, a fine of $12,500, and $400 in special assessments.

Finally, to increase the chances that Mr. Mogilyansky will serve his sentence at a BOP facility close to his wife, three small children, father and many other relatives who all live in the Philadelphia area, and so he can be close to attorneys in Philadelphia who represent him in active civil litigation unrelated to this criminal case, the defendant requests that the Court incorporate the following recommendation into the judgment:

> The Court strongly recommends that the Bureau of Prisons designate the Defendant to the Low security FCI Fort Dix, New Jersey, for placement close to his family, and to give him easier access to attorneys in the Philadelphia area who represent him in civil matters. If such designation cannot be accommodated, the Court recommends that the Defendant be designated to the Low security at FCI Allenwood-Low, Pennsylvania.

Respectfully submitted,

Date:  September 8, 2009

_____
JACK J. McMAHON , JR.
Law Office Of Jack McMahon
1500 Walnut Street
Suite 1100
Philadelphia , PA 19102
215-985-4443

Attorney for the Defendant

Of Counsel:

James H. Feldman, Jr.
50 Rittenhouse Place
Ardmore, PA 19003

610-649-8200

- 24 -

## INDEX OF EXHIBITS

A.    Letter to Court from Andrew Mogilyansky

B.    Report of Steven E. Samuel, Ph.D.

C.    International Foundation for Terror Act Victims

      1.    Summary of Foundation's activities

      2.    501(c)(3) public charity status letter from the IRS

      3.    Videos from Beslan terror attack victims with English transcripts
            3.1    Video 1 – Diana Murtazova
            3.2    Video 2 – Nonna Gioeva
            3.3    Video 3 – Ilona Kargieva
            3.4    Video 4 – Albert Kadalaev
            3.5    Video 5 – Rita Kachmazova

      4.    Videos – TV news coverage of the Foundation
            4.1    Video 6 – CNN Headline News 2004-09-09
            4.2    Video 7 – CBS Eyewitness News 2004-09-03
            4.3    Video 8 – ABC Channel 6 News 2004-09-03
            4.4    Video 9 – WB17 News 2004-09-04
            4.5    Video 10 – CBS Eyewitness News 2004-09-05

      5.    News articles on the Foundation

      6.    Pages from the "Thank you, everyone, who helped Beslan" book

      7.    List of over 300 Beslan terror attack victims who received aid from the Foundation

      8.    Letters from Russian Ambassador to U.S.
            8.1    Letter dated November 4, 2002, relating to Nord-Ost
            8.2    Letter dated September 9, 2004, relating to Beslan

D.    Letters to the Court

      1.    <u>Letters from wife and father</u>

            1.1    Oksana Mogilyansky, wife

            1.2    Alexander Mogilyansky, father

2.6    Nonna Gioeva, aunt of Ilona Gioeva, who lost an eye in 2004 Beslan School Terror Attack. Ilona was in the school with her mother and younger brother, both of whom died. Her father became mentally disabled as a result. Ilona was brought to the US with her aunt Nonna and underwent a successful eye implant surgery.

2.7    Rita Kachmazova, mother of Amina Kachmazova, who lost an eye in 2004 Beslan School Terror Attack. She was brought to the US with her mother to undergo an eye implant surgery and also an eyelid reconstruction surgery, both of which were successful

3.    <u>Letters from International Foundation for Terror Act Victims volunteers</u>

3.1    Michael Ratner, active Board Member of the Foundation. Has been Andrew's friend since the time they went to high school together.

3.2    Ella Bitarova, Foundation's main coordinator in Russia. Her sister was a hostage in the school and died. Ella became the Foundation's "Erin Brockovich" – she gathered all information on all the victims and helped to organize distribution of assistance.

3.3    Zhenya Kiperman, a Drexel University film professor and an active volunteer of the Foundation. He did a lot of work connected with bringing Diana Murtazova to the US and arranging her rehabilitation and surgery at Shriners Hospital.

3.4    Anton Likhodedov, active volunteer of the Foundation. He handled Foundation's web-site development and many other issues.

3.5    Georgiy Vasiliev, active volunteer of the Foundation in Russia. He is a prominent Russian singer and song-writer. He was the producer of the Nord-Ost musical and a surviving hostage of the 2002 Nord-Ost theater siege terror act. The Foundation's first project was fundraising for Nord-Ost terror act victims. Mr. Vasiliev became the head of the Foundation's Russian