IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Docket No.:  08-CR-711-1 |
| | ) | |
| vs. | ) | |
| | ) | |
| ANDREW MOGILYANSKY, | ) | September 16, 2009 |
| | ) | 9:34 a.m. |
| Defendant. | ) | |

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE MARY A. MCLAUGHLIN
UNITED STATES DISTRICT JUDGE

FILED

MAR 2 9 2012

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

APPEARANCES:

For the Government:                 MICHELLE MORGAN-KELLY, ESQUIRE
                                    U.S. ATTORNEY'S OFFICE
                                    615 Chestnut Street
                                    Suite 1250
                                    Philadelphia, PA  19106


For the Defendant:                  JACK J. MCMAHON, ESQUIRE
                                    LAW OFFICES OF JACK MCMAHON
                                    1500 Walnut Street
                                    Suite 1100
                                    Philadelphia, PA  19102


Audio Operator:                     RAYMOND WOLF

Transcribed by:                     DIANA DOMAN TRANSCRIBING
                                    P. O. Box 129
                                    Gibbsboro, New Jersey  08026
                                    Off: (856) 435-7172
                                    Fax: (856) 435-7124
                                    E-mail: dianadoman@comcast.net

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.




2

I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE DEFENDANT: | | | | |
| MARK CLARK | 16 | | | |
| STEPHEN MARTINELLO | 19 | 21 | | |
| MICHAEL RATNER | 22 | 26 | | |
| ANDREW GAY | 29 | | | |
| AKSANNA MOGILYANSKY | 33 | | | |
| FOR THE GOVERNMENT: | | | | |
| MARK STEELE | 36 | 41 | | |
| MEGAN DIPATRI | 46 | | | |

| VICTIM STATEMENTS: | PAGE |
|---|---|
| M.S.   (Read into Record) | 52 |
| E.K.   (Read into Record) | 53 |

| STATEMENT OF THE DEFENDANT: | PAGE |
|---|---|
| By Mr. Mogilyansky | 55 |

| ARGUMENT: | PAGE |
|---|---|
| Re:   Sentencing | |
| By Mr. McMahon | 62 |
| By Ms. Morgan-Kelly | 76 |

DECISION OF THE COURT:

By Judge McLaughlin

(The following was heard in open court at 9:34 a.m.)

THE CLERK:  Court is now in session, the Honorable Mary A. McLaughlin presiding.

THE COURT:  Good morning, everyone.

MR. McMAHON:  Good morning, Your Honor.

MS. MORGAN-KELLY:  Good morning, Your Honor.

THE COURT:  Please be seated.

We are here this morning in the case of the United States versus Mr. Andrew Mogilyansky, and the purpose of this morning's proceeding, of course, is for the Court to sentence Mr. Mogilyansky.

Mr. Mogilyansky pled guilty on April 30th of 2009 to one count of traveling in foreign commerce for the purpose of engaging in illicit sexual conduct with certain minor females and three counts of engaging in illicit sexual conduct.  The plea was pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.

The parties agreed that the appropriate sentencing range for these crimes was 78 to 97 months.  The Court accepted the plea and therefore, must sentence Mr. Mogilyansky within that range.

Let me acknowledge everyone who's here.  Ms. Morgan-Kelly for the Government, good morning, ma'am, and tell me who's with you.

MS. MORGAN-KELLY:  Good morning, Your Honor.  With

me is Supervisory Special Agent Megan Dipatri from the U.S. Immigration and Customs Enforcement.

THE COURT: Good morning to you, ma'am.

SPECIAL AGENT DIPATRI: Good morning.

MS. MORGAN-KELLY: And also the Deputy ICE Attache from Moscow, Mark Steele.

THE COURT: Good morning, sir.

DEPUTY STEEL: Good morning, Your Honor.

THE COURT: And here, of course, for Mr. Mogilyansky is Mr. McMahon. Good morning, Mr. McMahon again.

MR. McMAHON: Good morning, Your Honor.

THE COURT: And Mr. Mogilyansky's in the courtroom. Good morning to you, sir.

THE DEFENDANT: Good morning, Your Honor.

THE COURT: And here from Probation is Ms. Leslie Maxwell. Thank you very much for being here, ma'am.

MS. MAXWELL: Good morning, Your Honor.

THE COURT: Counsel, what I'd like to do is start with telling you what I have received and reviewed for purposes of this sentencing. If there's anything that I do not mention that you think I should have received, please just say so.

I have received the presentence report, of course, prepared by Ms. Maxwell dated June 22, 2009 as the date prepared and revised on July 20, 2009. I also received from

Ms. Maxwell two victim impact statements.

And, Mr. McMahon, I -- I have been told you did receive a copy of these.

MR. McMAHON:  That is correct, Your Honor.

THE COURT:  I also received from the Government, of course, a sentencing memorandum, and I received from the defendant a sentencing memorandum with voluminous attachments that are here in this binder.  Of course, I have read all of them and looked at the videotape.  You gave me a video of certain things --

MR. McMAHON:  It was a DVD, yeah.  DVD.

THE COURT:  Not video, a DVD.  With, of course, translations from -- from the Russian, and I have read all of that.  I read the transcript of the plea hearing and the transcript of the hearing on July 30th at which I accepted the plea.

Is there anything else that either of you think I should have received?  Ms. Morgan-Kelly.

MS. MORGAN-KELLY:  Nothing additional that has been submitted, Your Honor; however, I do have a one-page document that I'd like to present to the Court today which is simply a stipulation that the translation of the victim impact statements are accurate.

THE COURT:  Oh, sure.  Of course.

MS. MORGAN-KELLY:  May I approach, Your Honor?

THE COURT:  Absolutely.

MS. MORGAN-KELLY:  And I'm providing the Court with a copy, and I'll file the original with the clerk's office --

THE COURT:  All right.  Thank you very much.

MS. MORGAN-KELLY:  -- at the end of this proceeding.

THE COURT:  Mr. McMahon, anything else, sir, that you think I should have received that I did not mention?

MR. McMAHON:  No, Your Honor.

THE COURT:  All right.  Let us start, if we can, Counsel, by going to the presentence report, and I will ask the standard questions.

Mr. McMahon, did you receive the report in time to review it yourself and go over it with Mr. Mogilyansky?

MR. McMAHON:  Yes, Your Honor.

THE COURT:  And, sir, I know that the report itself at the end states certain objections that you have to certain paragraphs.  Do you still have those objections?

MR. McMAHON:  Yes, Your Honor.

THE COURT:  All right.  Are there any other objections to any of the facts in the report or any of its conclusions?

MR. McMAHON:  No, Your Honor.

MS. MORGAN-KELLY:  No, Your Honor.

THE COURT:  All right.  Nothing by Ms. Morgan-Kelly.

Mr. Mogilyansky, let me ask you, sir.  Did you

Colloquy                                                    7

receive the report in time to go over it yourself and review it with Mr. McMahon?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Sir, other than -- well, why don't we just state what your objections are, Mr. McMahon.

MR. McMAHON:  Yes, the --

THE COURT:  Which paragraphs of the report?

MR. McMAHON:  The objections, Your Honor, are -- go to paragraphs nine, ten and 12 as objection number one, as reflected on page 19 of the addendum to the presentence report.  That objection goes to the recitation of facts, Your Honor, that the details are not related to the events -- conduct as presented to the Court or to what this defendant pled guilty to.

THE COURT:  Mr. McMahon, let me stop you just with respect --

MR. McMAHON:  Sure.

THE COURT:  -- to your argument.  I just wanted you to tell me what it was.  It was paragraphs nine, ten, 12 and 13?

MR. McMAHON:  Nine, ten, 12 and 13, yes, Your Honor.

THE COURT:  Okay.  Fair enough.

MR. McMAHON:  And if I can -- and it's not every portion of that paragraph.

THE COURT:  Yes.

MR. McMAHON:  There are certain portions of them that are -- are accurate, but --

THE COURT:  Okay.

MR. McMAHON:  -- but only for reference I used the -- the numbers to address our attention to them.

THE COURT:  Sure.  And that's it, though, just those four paragraphs --

MR. McMAHON:  Yes, and --

THE COURT:  -- or parts of those four paragraphs.

MR. McMAHON:  That is correct, Your Honor, and if you want me to be specific as to which portions of the paragraphs, I will, and -- but they are the paragraphs, Your Honor, that deal, in essence, with -- as you remember, the -- having reread the plea agreement you know -- and the plea what the defendant pled guilty to, and they were the counts of the indictment that charged as you already indicated.

THE COURT:  Uh-huh.

MR. McMAHON:  There are facts in here that the presentence put in that was originally part of the investigation that the defendant has not pled to, nor has he admitted to and vociferously would defendant himself if those were the issues before the Court.

And by no means does this in any way an attempt to, and you will hear as we go on in this case, an attempt to minimize or change what in fact he did and what he's admitting

to, which are all the counts in the indictment.  It's just these other portions of it that he vehemently denies and does not believe should be a factor for this Court to consider at sentencing.

THE COURT:  Uh-huh.

MR. McMAHON:  And, as you see, they can refer to his -- the statements in -- but, for example, paragraph ten where he supposedly invested money with the expectation to receive a percentage of the profits from the commercial sex acts.  He has -- we have vehemently objected to that.  Nor has he ever admitted to that conduct.

Now, again, that's not conduct that is part of the actual counts of the indictment, but if it's in the presentence report and if it's going to follow him as a -- a document that explains his conduct, then we think it should not be in there.

If I have a moment, Your Honor.

THE COURT:  Sure.  Well, while you're looking at that, though, let me just talk to Mr. Mogilyansky for a second so I can complete that.

I think you had said, Mr. Mogilyansky, that you had read the report, you received it in time to read it and talk with Mr. McMahon about it.

THE DEFENDANT:  Certainly, Your Honor.

THE COURT:  All right.  Now, other than parts of

paragraphs nine, ten, 12 and 13, do you have any objections to the report?

THE DEFENDANT: No, Your Honor.

THE COURT: Okay. All right. And Ms. Kelly -- Ms. Morgan-Kelly, you do not have any.

I just wanted to establish that, Mr. McMahon.

Now let's discuss -- you can take all the time you want.

(Pause in proceedings.)

THE COURT: Ma'am, let's discuss those paragraphs. Initially, I'd just like to discuss sort of conceptually whether or not they should be in the report at all and under what legal theory they're there.

Ms. Morgan-Kelly, what is your view? Do you believe -- putting aside for the moment whether these facts are true and we can -- and obviously I -- I will hear from you on that, or, rather, the Government can show by a preponderance of the evidence that -- that they are.

Should the Court be considering these facts that are outside the set of facts that Mr. Mogilyansky agreed to at the plea hearing?

MS. MORGAN-KELLY: Absolutely, Your Honor. The Court should consider any and all facts relevant to its determination of sentence and, certainly, all of the materials that have been presented to the Court. Many of them go far

beyond what is charged in the indictment, both on the positive side and on the negative side.

Certainly, the Probation Office has had the opportunity to review the evidence in this case. The information set forth in these paragraphs provides the context for -- for the crime that occurred here and is undoubtedly relevant conduct to what has been specifically charged in the indictment. So we believe the Court should consider it.

THE COURT: Mr. McMahon, what is -- why isn't this relevant conduct --

MR. McMAHON: Well --

THE COURT: -- quote, unquote, within the --

MR. McMAHON: -- Judge, it would be relevant --

THE COURT: -- within the guidelines?

MR. McMAHON: The legal concept of it being relevant conduct is accurate.

THE COURT: Uh-huh.

MR. McMAHON: The question is, is it true. That's a different issue. You can put in there all sorts of allegations that may be relevant conduct, but the defendant is not accepting them --

THE COURT: Sure.

MR. McMAHON: -- or admitting to them.

I agree. I agree --

THE COURT: Okay. All right.

MR. McMAHON:  -- that if in fact this was true --

THE COURT:  Okay.

MR. McMAHON:  -- and there was evidence to support it and there was -- we would agree --

THE COURT:  Okay.

MR. McMAHON:  -- that it puts it in context, and that there's --

THE COURT:  Okay.

MR. McMAHON:  -- it is relevant conduct.

THE COURT:  Okay.

MR. McMAHON:  But we vehemently deny --

THE COURT:  That it's --

MR. McMAHON:  -- for example, ICE agents, and -- and counsel says that the Probation reviewed the evidence, but Probation didn't review the evidence.  They were given exactly what the Government handed to them.

THE COURT:  Mr. McMahon, let me just stop you just for this reason.

I don't know what Ms. -- I mean I haven't seem what Ms. Maxwell reviewed to make these statements.  I mean I have complete confidence in Ms. Maxwell --

MR. McMAHON:  Oh, I do, too.

THE COURT:  Hold on for -- I have to make the decision.  So I'm about to turn to Ms. Morgan-Kelly and ask her if she intends to put on evidence.

Obviously, it can be hearsay evidence, but do you intend to evidence with respect to the factual disputes about these paragraphs, ma'am?

MS. MORGAN-KELLY:  If required to, yes, Your Honor.

THE COURT:  Yeah.  I think we do need to, or else I need to understand everything Ms. Maxwell had because I need to decide by -- that there is support for this beyond a preponderance of the evidence, and obviously I'm not questioning anyone's credibility or anything.  It's just that it is my decision that I have to make.

So the question is if we are going to leave in nine, ten, 12 and 13 for the moment, I would need to understand the basis for it, and as I said a moment ago, the Court can look at -- consider hearsay evidence, of course, in a sentencing hearing.

So what we can do -- I mean I can -- we can start. Mr. McMahon, I'll leave it up to you, sir.  We can start now with my asking Ms. Morgan-Kelly to present whatever evidence she would like to on these paragraphs, or we can go through what the presentation is you would like to make today and then go to Ms. Morgan-Kelly.

MR. McMAHON:  May I have a moment, Your Honor?

THE COURT:  Absolutely.

(Pause in proceedings.)

THE COURT:  Counsel, if you need some time to

confer, I'm happy to go off the bench for a moment --

MR. McMAHON:  Give me about five minutes.

THE COURT:  -- and let me do that.

MR. McMAHON:  Five minutes.

THE COURT:  Absolutely.  Thank you.

THE CLERK:  All rise.

(Recess taken, 9:45 a.m. to 9:49 p.m.)

THE CLERK:  All rise.

THE COURT:  Thank you.  Please be seated, everyone.

All right.  Counsel, how would --

MR. McMAHON:  If Your Honor please.

THE COURT:  -- you like to proceed?

MR. McMAHON:  This is after reflection on the -- what -- the purposes of what we're here for today and what he's pled to.  We will at this juncture, rather than go through a whole --

THE COURT:  Uh-huh.

MR. McMAHON:  -- mini-trial, and it may be at some length, and we do not have necessarily all the documents or the preparation necessary.  We will withdraw those at this time to move forward.

THE COURT:  Okay.

MR. McMAHON:  We wish to move forward on this.

THE COURT:  Okay.  So you will withdraw your objection.

MR. McMAHON:  Yes.

THE COURT:  Okay.  Mr. Mogilyansky, is that correct, sir?

THE DEFENDANT:  Yes, it is.

THE COURT:  All right.  All right.  Then at this point I accept the facts that are in the presentence report as the Court's findings of fact for purposes of this hearing. Obviously, there are other facts that the Court is dealing with, as well, including, of course, what Mr. Mogilyansky has presented and the victim impact statements.

And so, therefore, Mr. McMahon, I'll hear from you sir, as to the appropriate sentence in this matter.  You may proceed as you see fit.

MR. McMAHON:  Okay.  If Your Honor please, is first of all, obviously I would incorporate the presentence memorandum --

THE COURT:  Yes.

MR. McMAHON:  -- and documents into that.

I will call a limited amount of witnesses here today because many of them have already indicated their feelings to you by way of a more reflective and thought-out letter, but some, I feel, will be presented here today.

We will start, Your Honor, with a Mr. Mark Clark.

THE COURT:  Certainly.  Mr. Clark, where are you, sir?  Come right up, sir, to your left, up this way, if you

would.  Come on up to the witness stand.  Watch your step.

Step right into the witness stand, if you would, sir.  Stand in front of the chair.  Raise your right hand, and you will be sworn in or you may affirm.

MARK CLARK, DEFENDANT'S WITNESS, SWORN

THE CLERK:  Please be seated.  Will you please state your name and spell your last name for the record?

THE WITNESS:  Mark Clark, C-L-A-R-K.

THE COURT:  You may proceed, Mr. McMahon.

MR. McMAHON:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. McMAHON:

Q    Good morning, Mr. Clark.

A    Good morning.

Q    Mr. Clark, what type of work do you do?

A    I -- I'm a professor of classics at a small liberal arts college in Virginia, Christendom College.

Q    Okay.  And you're here in Philadelphia today testifying. How did you get here today?

A    I came up last night by train, and -- and walked --

Q    And why did you come up here by train from Virginia?

A    To serve as a character witness for Andrew.

Q    Okay.  And how do you know Andrew Mogilyansky?

A    I've known Andrew since we were in graduate -- well, I was in graduate school.  He was in undergraduate school at

Columbia University, early 1990s.

Q    And what was the nature of your relationship back then in the early 1990s?

A    We were close friends.

Q    When you say "close friends," what does that mean?

A    I got to know Andrew very well, and he was -- at Columbia he was among my closest friends, indeed, really, the -- the one friend I've -- I've kept from those -- those years at Columbia University.

Q    So after you both went -- left Columbia, you remained in touch with Mr. Mogilyansky?

A    We have.

Q    In what fashion?

A    Just down through the years staying in touch. Sometimes -- sometimes seeing each other, sometimes phone calls.

Last summer, for example, my family and I visited Andrew and his family up here outside of Philadelphia on my way up to a conference in Boston and -- and back.

Q    So I take it from all that you've told us here you -- you feel you know Mr. Mogilyansky pretty well.

A    I think so.

Q    Okay.  Now, shortly this morning the Judge is going to sentence Mr. Mogilyansky to a sentence, and what I'm asking you now, is there anything that you would like to share with

the Court that may be helpful to the Court in fashioning the proper sentence for Mr. Mogilyansky?

A    As you said before, I already submitted a letter to the Court.

I suppose at this point all I would like to say is ever since I knew Andrew, since I first got to know him and through all these years he's been someone whom -- whom I admired as a -- as a person of high character and -- and just someone I admired.

First of all, he's the smartest person I ever knew by far, and also -- but he was also -- I've always considered Andrew a very, very good person, and so I just wanted to come up here and say that for all the years I've known him I've looked up to him and admired him.

And I think that's all I want to say.

Q    Thank you.

MR. McMAHON:  I have nothing further of Mr. Clark.

THE COURT:  All right.  Any questions, Ms. Morgan-Kelly?

MS. MORGAN-KELLY:  No, Your Honor.

THE COURT:  Thank you very much, sir.  You may step down.

MR. McMAHON:  Stephen Martinello.

THE COURT:  All right, sir.  Come up, again, to your

left, right up this way, if you would, to the front of the courtroom.  Come right into the witness stand.

You can stand in front of the chair.  Raise your right hand.  You'll be sworn in or you may affirm.

STEPHEN MARTINELLO, DEFENDANT'S WITNESS, SWORN

THE CLERK:  Please be seated.  Can you please state your name and spell your last name for the record?

THE WITNESS:  All right  My name is Stephan Martinello.  Last name is M-A-R-T-I-N-E-L-L-O.

THE COURT:  All right.  Thank you.

You may proceed.

DIRECT EXAMINATION

BY MR. McMAHON:

Q     Mr. Martinello, good morning.

A     Good morning.

Q     Mr. Martinello, what type of work do you do?

A     I'm a software engineer.

Q     And where is that at?

A     In Melbourne, Florida, south of Cape Canaveral.

Q     And is that where you reside?

A     It is, indeed.

Q     Okay.  And so I take it you came to Philadelphia for the purposes of attending the sentencing, is that correct?

A     Specifically.  Last night I flew in, and I intend to fly out later this afternoon.

Q   Why is it that you took those efforts to come here?

A   Oh, well, for the very important reason of making sure that the Court understands fully well the sort of character that Andrew exhibits.

Q   Now, did you also write a letter to Judge McLaughlin?

A   Yes, and in there that's -- that is really more fully reflecting my high opinion of --

Q   Well --

A   -- Mr. Mogilyansky.

Q   And if you would, would you tell us how you came to know Mr. Mogilyansky?

A   Well, I, too, came to know Mr. Mogilyansky at Columbia University.

Q   And were you a student there?

A   Yes, we were both students at the time, yeah.

Q   And what was the nature of your relationship at Columbia University?

A   Well, we were very close friends and have remained so through the years.

Q   As a result of that friendship and knowledge of Mr. Mogilyansky is there anything that you would like -- in addition to your letter, as we all know, is there anything that you would like to say now that would help the Judge fashion an appropriate sentence for Mr. Mogilyansky later on today?

A    Yes.  Well, Mr. Mogilyansky is a man of extraordinarily warm character.  He is of extreme generous nature who I've seen countless times help out other people as his first impulse, and he is a man, of course, of the highest character and in some -- I can -- I can fully well say that he -- that deserves quite -- quite a good bit of consideration.

Q    Thank you, sir.

THE COURT:  Anything, Ms. Morgan-Kelly?

CROSS-EXAMINATION

BY MS. MORGAN-KELLY:

Q    Good morning, sir.

A    Sure.

Q    Have you engaged in real estate transactions with Mr. Mogilyansky?

A    Yes.  Yes, the home in which I currently reside, the two of us jointly purchased and jointly used, and at this point is solely my home.  That -- that transaction came and went.

Q    Any other financial transactions?

A    Nothing substantive besides a loan to have dinner together at school and --

Q    Okay.  Thank you.

A    Sure.

THE COURT:  Anything further, Mr. McMahon?

MR. McMAHON:  No, Your Honor.

THE COURT:  Thank you very much, sir.  You may step

down.

THE WITNESS: Thank you.

MR. McMAHON: Michael Ratner.

THE COURT: Mr. Ratner, right over here, sir. Come right up to the witness stand, please, Mr. Ratner.

Step right into the witness stand. Raise your right hand, and you'll be sworn in or you may affirm.

MICHAEL RATNER, DEFENDANT'S WITNESS, SWORN

THE CLERK: Please be seated. Will you please state your name and spell your last name for the record?

THE WITNESS: Michael Ratner, R-A-T as in Tom, N as in Nancy, E-R.

THE COURT: You may proceed, Mr. McMahon.

MR. McMAHON: Thank you.

DIRECT EXAMINATION

BY MR. McMAHON:

Q    Mr. Ratner, how are you employed?

A    I work as an information manager in an investment bank.

Q    And do you know my client, Andrew Mogilyansky?

A    Yes. I have known Andrew for, I would say, over 25 years now.

Q    And how did you come to know him?

A    We -- literally met him before high school, but we became close friends in high school in Russia.

Q    Where in Russia?

Ratner - Direct                                     23

A     In St. Petersburg.

Q     Okay.

A     The -- yeah, the -- it was a specialized school for advanced study of physics and mathematics.

And then after that we both emigrated to the U.S., and we both became students at Columbia University.  So I continued to be friends with him there and classmates.

After that we kept in touch.  We didn't work together or anything, but we remain close friends up till now.

Q     Okay.  And did you become involved with Mr. Mogilyansky in the early part of this decade involving some sort of charitable work?

A     Right.  When I say we didn't work together, I referring to a for-profit activity.

Yes, we both worked at the National Foundation for Terror Act Victims, which is a charity organization that Andrew created.

Q     Well, tell us a little bit about the circumstances, how you became involved with that, and you say Andrew created, what you mean by that.

A     This was an organization that basically he created originally, as I recall, to respond to the 2002 hostage terrorist crisis in Russia, the Nord-Ost Theater crisis.

He basically looked for an organization that could help from here, from the U.S., and he didn't find one so he decided

to create one. I didn't work with him on that, but as far as I understand it, it was reasonably successful, and it certainly helped establish a level of trust in -- in his activities.

And then later when the Beslan hostage crisis occurred, he called me the next day, and he said that he really wants to use the foundation as the vehicle for helping the children, victims, and he -- I joined -- I joined up.

And he and a few other people and myself basically ran the organization. There were a number of volunteers. We collected over $1.2 million, which was more than the Red Cross has collected. There were over 8,000 donors.

And I just want to say that Andrew exhibited unbelievable amount of selfless dedication in -- in that work.

Q    What do you mean by that? What -- what leads you to that conclusion?

A    Well, for example, as those of you who have participated in charity work might know, the first few days of -- after the event are critical to the success of -- of the venture, and I think for the first 72 hours or so Andrew just didn't sleep a single minute. I think he was basically working all the time.

He -- he was on the phone to potential donors. He oversaw the restructuring of the website. He hired volunteers. He put out press releases. It was just a non-stop activity and -- because he was conscious of the fact that

the time was -- was very important.

And then after that, as well, I would say for -- at least for a few months of his life this was his sole focus.  And -- and after that, when we were able to collect funds, and he was instrumental in both that and organizing distribution of funds, he also was very keen to make sure that it wasn't just the monetary assistance, but also that children who couldn't get complex medical care of the type that might not have been available in Russia would have a chance to get that medical care abroad.  And with that in mind he personally organized treatment for some of these kids here in the U.S.

Q     Are you familiar with any of those situations?

A     Certainly.  Yeah, there were -- there were several children who were brought here for eye implants, and one of them actually stayed in my house.

There was a girl named Diana Muratova who was brought over here for complicated operations, and Andrew organized her stay in Philadelphia.

There were Kadalaevas, there were Kachmazovas.  There are several names that I can -- I can mention, yes.

Q     And in addition to just money, what -- what things were done for them here in the United States that assisted them in their recovery?

A     Well, the -- some of them, as I said, came here for eye implants.  Others came here for surgical treatment, such as

Diana, which had very extensive injuries as a result of the terrorist act, and she required rehabilitation and -- and surgery, and both of those were organized here.

Q    In addition to what you talked about, and the Judge has gotten a lot of things about this organization, other things regarding the character and nature of Mr. Mogilyansky that you feel might be helpful to the Judge in determining what's the proper thing to do at this stage of the proceedings?

A    Well, I feel that Andrew is someone that I've had the honor of -- and the privilege of knowing, Your Honor.  It is not very often that one gets a chance to participate in something that -- that is larger than yourself and -- and get a chance to help people at the level that Andrew was able to organize.

So I certainly would like to say that it's one of the highest points of my life working with him, and, therefore, I would like to request that --

Q    Thank you, Mr. Ratner.

THE COURT:  Ms. Morgan-Kelly.

CROSS-EXAMINATION

BY MS. MORGAN-KELLY:

Q    Good morning.

A    Good morning.

Q    You are aware that the charity you are speaking about is being investigated for fraud by the Pennsylvania Department of

Ratner - Cross                                                        27

State, correct?

MR. McMAHON:  Objection, Your Honor.  Well, no, go ahead.

THE COURT:  I have assume Ms. Morgan-Kelly has a basis to ask the question.

MR. McMAHON:  Well, I mean --

THE COURT:  I mean I'm happy --

MR. McMAHON:  -- when did you stop beating your wife --

THE COURT:  -- to go to sidebar.

MR. McMAHON:  -- is the same kind of --

THE COURT:  Well, then, let's -- let's go to sidebar for a moment if there's a question about --

MR. McMAHON:  Yes, let's do.

THE COURT:  -- the reasonableness of the question.

(Sidebar discussion held, 10:06 a.m. to 10:07 a.m.)

THE COURT:  What's the story?  Do we really need to go here?  What's the -- is it being investigated?  I assume it is or you wouldn't have asked the question.

MS. MORGAN-KELLY:  That's the question I have. Yeah, it is being investigated, and I have had an opportunity to interview both him and Mr. Mogilansky, so he certainly --

THE COURT:  Independent of this prosecution, you mean, just independent --

MS. MORGAN-KELLY:  Yes.

Ratner - Cross                                          28

MR. McMAHON:  Well, Judge, that's -- what -- what does that -- what does that mean?  What does that mean?

THE COURT:  Yeah, an investigation.  I'm going to sustain the objection.

(Sidebar concluded.)

THE COURT:  All right.  Anything else, Ms. Morgan-Kelly.

MS. MORGAN-KELLY:  No, thank you, Your Honor.

THE COURT:  All right.  Thank you, sir.  You may step down.

THE WITNESS:  Thank you.

THE COURT:  All right.  Mr. McMahon.

MR. McMAHON:  What is -- what --

THE COURT:  Oh, take your time.

(Pause in proceedings.)

MR. McMAHON:  Andrew Gay.

THE COURT:  Mr. Gay, right up here, sir, to my right.  Step right into the witness stand.  Raise your right hand, and you'll be sworn in or you may affirm.

ANDREW GAY, DEFENDANT'S WITNESS, SWORN

THE CLERK:  Please be seated.

THE WITNESS:  Thank you.

THE CLERK:  Can you please state your name and spell your last name for the record?

THE WITNESS:  Andrew Gay, G-A-Y.  Good morning, Your

Honor.

THE COURT:   Good morning, sir.

You may proceed, Mr. McMahon.

MR. McMAHON:   Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. McMAHON:

Q    Mr. Gay, what is your occupation?

A    I'm an attorney in Pennsylvania.

Q    Okay.   And how long were you a member of the Bar of Pennsylvania?   How long were you?

A    Forty-some years, almost 50 years.

Q    And did you come to know my client, Mr. Andrew Mogilyansky?

A    I did.   Twelve years ago I was introduced to Andrew by my good friend, John Friedman.

Q    And where -- do you recall what the reason was for that introduction or where that was -- how that developed?

A    I really don't remember the details of it at this time, but it was -- it had -- it was some minor matter that -- at the time that Mr. Mogilyansky needed handled -- needed handling, and he came to me.

Q    So originally it was in a professional capacity, the -- the first instance of meeting, is that correct?

A    Yes.

Q    Okay.   Now, in the 12 years since that initial meeting

Gay - Direct                                                    30

have you come to know Mr. Mogilyansky in any other fashion, other than that limited professional way?

A    Yes, I have.

Q    Could you describe to the Judge, if you can, the -- the nature and the depth of the relationship that you had with Mr. Mogilyansky over these 12 years and how it developed.

A    Well, it's going to take awhile.  I -- I met Andrew first, and it was a -- we had a professional relationship in the very beginning, and over -- it wasn't a long time after that, I'd say two or three years, we became more and more friendly.  I met his family, his father.  I met Aksanna.  I met many of his friends and some of his more distant relatives, and we just started seeing a lot of each other.

At the time Andrew had a lot of time to spend, more than he did in more recent years, and we spent a good bit of time together.  I -- I spent time at his home, and he came to visit us when we lived over in -- on Oxford Avenue in -- in Philadelphia, which is right across from the art museum.

And I handled more and more matters for him, and that required that I just see him more and more, and there were -- literally there was -- I guess over the time that I've known him I've been together with him for hundreds of hours.

During that time I've handled a lot of litigation, a lot of smaller matters for him.

And I -- I want to say one thing, Your Honor.  During the

course of that litigation Andrew always took the high road. I mean I -- I never saw him try to take unfair advantage of any situation that arose in any of that litigation, and that was so not only in -- but also in his personal dealings with other people.

He always treated them fairly. He was -- he's a -- as was said here before, he's a very intelligent young man. He -- and he shares his intellect with those people that he cares for. If there's a friend in need or if -- if he sees that someone is doing something and it can be done in a better way and more effective, Andrew was -- jumps right in and helps them out with it. I've seen that dozens of times.

We became so close that finally we decided to buy a home together at Brigantine, and we owned that home together. Now our families do.

And after we bought that house at Brigantine, we spent weekends together, and I just never have seen him do anything, you know, that was -- that would shock -- would shock anyone's conscience. I mean he just -- he was always -- he operated on the up and up personally and in business and in all legal matters that I handled for him.

He was -- he and my son were the -- and their families were the only people that attended my wedding when I married my wife, Maria, who's here today.

And I mean this is -- this is something that I just think

does not come close to representing his character, which, in my opinion, is -- until I heard about this was just beyond reproach.

Q    Thank you.

MR. McMAHON:  I have no other questions.

THE COURT:  Anything, Ms. Morgan-Kelly?

MS. MORGAN-KELLY:  No, Your Honor.

THE COURT:  Thank you, Mr. Gay.  You may step down, sir.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Watch your step.

MR. McMAHON:  Dr. Samuel.

(Dr. Samuel's testimony previously transcribed.)

MR. McMAHON:  Could we take a brief recess of a couple minutes?

THE COURT:  Absolutely.  Let's take -- ten minutes enough?

MR. McMAHON:  That'd be fine.  Thank you.

THE COURT:  Ten-minute recess.

THE CLERK:  All rise.

(Recess taken, 10:44 a.m. to 11:22 a.m.)

THE CLERK:  All rise.

THE COURT:  Thank you.  Please be seated, everyone.

And, Mr. McMahon, you --

MR. McMAHON:  Thank you, Your Honor.

THE COURT:  -- may proceed, sir.

Everyone may be seated.

MR. McMAHON:  Aksanna Mogilyansky.

THE COURT:  Come right up, please, Ms. Mogilyansky, right up here to my right, ma'am.  Watch your step.

Step right into the witness stand if you would. Just step in front of the chair.  Raise your right hand, and you'll be sworn in or you may affirm.

AKSANNA MOGILYANSKY, DEFENDANT'S WITNESS, SWORN

THE CLERK:  Please be seated.  Would you please state your name and spell your last name for the record?

THE WITNESS:  Aksanna Mogilyansky, M-O-G-I-L-Y-A-N-S-K-Y.

THE COURT:  You may proceed, Mr. McMahon.

MR. McMAHON:  Thank you.

THE COURT:  And, ma'am, that chair does move so you can get -- yeah, there you go, get more comfortable.

Go ahead, Mr. McMahon, if you would.

DIRECT EXAMINATION

BY MR. McMAHON:

Q    Ms. Mogilyansky, good morning.

A    Good morning.

Q    Okay.  Obviously, your relationship with the defendant is you are his wife, correct?

A    Yes.

A. Mogilyansky - Direct                               34

Q    Would you -- did you also write a letter to the Court --

A    Yes, I did.

Q    -- and submitted it in -- on a more full and reflective tone?

A    Yes, I did.

Q    Is that correct?  You've asked me to -- be able to come forward here today to say a few words to Judge McLaughlin about the nature and character of your husband that may be helpful for the Judge to understand --

A    That's correct.

Q    -- since, presumably, you know her -- him better than the Judge, and, therefore, we would ask you to give some insight into him that may be helpful.

A    Okay.  Your Honor, as you know in the time since the incident Andrew and I became parents, and we now have three beautiful children, all under the age of three.

     If the way you treat your family could be a measure of how good of a person you are, then if you ask me and my kids, Andrew is the best man in the world.  We love him more than words can ever say.  He is a wonderful man, and I feel fortunate to be his wife.

     Andrew's deeply sorry for the mistakes that he made, and ever since he has tried to make amends in every possible way he could, and I'm sure having the defendant's memorandum and the exhibits, you are able to see that his life and his good

deeds are a testament to that.

We cannot turn back the clock, obviously.  The only thing we can -- the only thing in addition that we can do is to minimize the harm that this would cause in the future.

Your Honor, when you consider all the facts in this case, I ask you to please remember the innocent victims of this, our three children, because the longer Andrew is away from us, the more damaged their little souls will be, and I just ask you to please do not let our family suffer for more than you absolutely have to.

Thank you.

THE COURT:  Thank you very much.

MR. McMAHON:  Nothing further.

THE COURT:  Did you have anything, Ms. Morgan-Kelly?

MS. MORGAN-KELLY:  No, Your Honor.

THE COURT:  Thank you very much.  Watch your step --

THE WITNESS:  Thank you.

THE COURT:  -- stepping down.  Thank you.

MR. McMAHON:  Judge, at this juncture that would conclude the live presentation --

THE COURT:  All right.

MR. McMAHON:  -- of witnesses, other than the defendant's right to allocution, which we discussed --

THE COURT:  Sure.

MR. McMAHON:  -- and argued.

THE COURT:  Sure.  All right.

Then at this point I'll turn to Ms. Morgan-Kelly, ma'am, for any witnesses or evidence that you would like to present.

MS. MORGAN-KELLY:  We just have a couple of very brief witnesses --

THE COURT:  Sure.

MS. MORGAN-KELLY:  -- Your Honor.  We would first call the Deputy ICE Attache from Moscow, Mark Steele.

THE COURT:  Come right up, sir, if you would.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  And I know you've heard me tell everybody to just step into the witness stand and --

THE WITNESS:  Yes, ma'am.

THE COURT:  -- raise your right hand.

MARK STEELE, GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Please be seated.

THE WITNESS:  Thank you.

THE CLERK:  Can you please state your name and spell your last name for the record?

THE WITNESS:  Yes.  My name is Mark Steele.  That's M-A-R-K S-T-E-E-L-E.

DIRECT EXAMINATION

BY MS. MORGAN-KELLY:

Q    Good morning.

A     Good morning, Your Honor.

      THE COURT:   Good morning, sir.

BY MS. MORGAN-KELLY:

Q     Where are you employed?

A     I am currently the Deputy Department of Homeland
Security, Immigration and Customs Enforcement Attache to
Russia.

Q     And where are you physically located for that employment?

A     In the United States Embassy in Moscow.

Q     And you are a special agent with ICE, correct?

A     That's correct.

Q     And how long have you been with ICE?

A     I've been a special agent for 21 years.  The last --
Department of Homeland Security and ICE was formed, I believe,
in 2003, so since 2003 I've been with ICE.

Q     And what do your job responsibilities include now that
you are the Deputy ICE Attache in Moscow?

A     A wide range of responsibilities.  We continue to -- I
continue to have investigative responsibilities, and that's
the primary mission of our office in Moscow at the embassy.

      We liaise with Russian law enforcement on a variety of
cases.  ICE is -- has a comprehensive body of statutes that we
enforce, and we have cases that represent pretty much all of
them in Russia.

Q     And a great amount of your work relates to sex tourism in

this -- investigations of American citizens traveling to Russia to have sex with children, correct?

A    That's correct.

Q    Did you have the opportunity to interact with Russian law enforcement on this case?

A    Yes, I did.

Q    And did you have the opportunity to meet the victims in this case?

A    Yes, I did.

Q    You met two of three victims, correct?

A    That's correct.

Q    And where did you meet with those victims?

A    I met with them at the offices of the investigative committee under the Procuracy in St. Petersburg, Russia.

The Procuracy is a -- is the rough equivalent of the United States Department of Justice, and they have an investigative arm which conducted the substantial part of this investigation.

Q    The victims are currently residents of St. Petersburg?

A    Yes, they are.

Q    Okay.  So you traveled from Moscow to St. Petersburg.

A    That is correct.

Q    And how -- how did you go about making the arrangements to meet with the victims?

A    Well, as I said, the investigative community and the

Procuracy had conducted a -- a significant component of the investigation, so we liaised with them, as we -- as we do on all our investigations, and they contacted the victims through -- by telephone and asked them if they would be willing to come in and give statements.  They indicated they would.

So at that point we traveled.  We obtained the victim impact statements from the United States Attorney's Office in Philadelphia and -- and brought those with us and presented them to them at the offices.

Q    More specifically, you obtained questionnaires, correct?

A    That's correct.

Q    And -- and those questionnaires presented three questions?

A    That's correct.

Q    Were those translated into Russian?

A    Yes, they were.

Q    And before presenting those quetionnaires to the victims, did you give them any additional information?

A    Only the -- a translated -- a translation, a verbal translation of the instructional sheet that accompanies the questionnaire.

Q    Did you advise them that their statements would be made part of the court record?

A    Yes, that's part of the instructional sheet.

Q    And did you advise them that the Court and the prosecutor and defense counsel would each have the opportunity to read those statements?

A    Yes.  Again, that's part of the instructional sheet that was translated verbatim.

Q    I won't refer to the victims by name, but specifically you met with the victims whose initials are M.S. and E.K., correct?

A    That's correct.

Q    And could you just briefly describe your meeting to the Court?

A    Yes, we -- both are currently employed in service sector jobs in St. Petersburg.  So we arranged a meeting for a time after their employment, which was late afternoon, early evening.

Q    Do you recall the date?

A    Yes.  It was July the 14th of this -- this summer.

Q    Okay.

A    2009.  So we appeared, you know, 15, 20 minutes before the appointed time, and at the appointed time both girls appeared, and we pretty much launched right into it.

We were given an office to conduct, you know, to present them with the -- with the statements, and we, you know, went through the instructional sheet, and they grabbed pen in hand immediately, and with some enthusiasm and began to write,

which surprised us.  We had been told that that might occur, that they may be reluctant to in fact go -- go back through the experience.  But, no, they -- they took pen in hand and began to write immediately.

Q    And about how much time did they take writing the statements?

A    I would say at least 20 minutes.

Q    And did they indicate a willingness to come to the United States and testify, if necessary?

A    Yes, they did.  We asked them that question explicitly, and they stated they -- they would come and testify in court.

Q    Both of them?

A    Yes, both of them.

            MS. MORGAN-KELLY:  I have no additional questions, Your Honor.

            THE COURT:  All right.  Mr. McMahon.

            MR. McMAHON:  The only question.

                    CROSS-EXAMINATION

BY MR. McMAHON:

Q    This was -- July the 14th was after Mr. Mogilyansky had in fact pled guilty, correct?

A    That's correct.

Q    And the purpose of those statements was not informational as to what happened to them, but were victim impact statements, right?

Steele - Cross                                     42

A     That's correct, sir.

Q     And as a result of his plea of guilty those girls that were in St. Petersburg who were -- you had to go visit, they did not have to come to the United States and relive it, as you just said that they -- you thought they may be a bit reluctant, even on paper, but as a result of his plea they did not have to come to the United States and relive it in person, did they.

A     You know, the requirements of the -- of the court hearings at that point, sir, were not -- were not something that we evaluated.

We simply asked them as -- as per our instructions if they would be willing to come and testify.  They indicted they would.

Q     Well, let me ask you a question.

You were aware at that point in time that Mr. Mogilyansky had in fact pled guilty, correct?

A     That's correct, sir.

Q     Okay.  And one of your jobs is to communicate with victims and whatnot in the capacity that you did in this case, correct?

A     That's correct.

Q     And I take it that when you went to them, that you informed them that in fact Mr. Mogilyansky had in fact pled guilty.  That's why they are having victim impact statements,

correct?

A    If that was on the instructional sheet, then that would have been part of our explanation to them.

We didn't go outside of the instructional sheet.  We just presented them -- again, this was an opportunity for them to tell their story, not for us to preface the story with -- with facts.

We weren't conducting any of the investigation.  We were simply presenting them with an opportunity --

Q    And I understand that.

A    -- to tell their story.  Yeah.

Q    But my question to you is did you personally -- I mean you walked in and talked to them.  You gave them a sheet, but you -- you said other words to them, correct?

A    We introduced ourselves and -- and provided them a translation of the -- of the sheet.

MR. McMAHON:  May I have a copy of that sheet, please?

THE COURT:  Sure.  Do you have it, Ms. Morgan-Kelly?

MS. MORGAN-KELLY:  I do, Your Honor.

THE COURT:  Okay.

BY MR. McMAHON:

Q    And in this statement, as counsel just pointed out to me since I've never seen this before or one like this, it says, "If the defendant pleads guilty or is found guilty after

trial, your impact statement will help the Judge understand how this crime has affected you and those close to you," correct?

A    Right.  That's correct.

Q    Well, you know, where it says, "If the defendant pleads guilty," you knew at that point in time that he had pled guilty, right?

A    Well, I think -- again, as I stated previously and I'll state again, our intent was to simply provide the sheet and to translate the sheet.

We did not go into the specifics of Mr. Mogilansky's pleas or any other facts related to the case.  We simply wanted to give them an opportunity to tell their story --

A    Okay.

Q    -- and they did.

A    And I'll ask you again.  You -- you, sir --

A    Right.

Q    -- were aware that he had pled guilty at that time, right?

A    That's correct.

Q    Okay.  And you were aware that this plea of guilty avoided their having to come and testify about what happened to them in an American Court as to the -- whether he was guilty or not guilty, correct?

                MS. MORGAN-KELLY:  Objection, Your Honor.  I think

we've gone over this.

THE COURT:  Well, I think --

MR. McMAHON:  I understand.

THE COURT:  But it is clear, obviously, the plea of guilty did mean that they didn't have to come.  I mean Ms. Morgan-Kelly understands that, so --

MR. McMAHON:  Okay.

THE COURT:  -- I think that's fine.

MR. McMAHON:  I have no other questions.

THE COURT:  Okay.  Anything further, Ms. Morgan-Kelly?

MS. MORGAN-KELLY:  Not from this witness, Your Honor.

THE COURT:  Yes.  Thank you very much, sir.

THE WITNESS:  Thank you.

THE COURT:  You may step down --

THE WITNESS:  Thank you, Your Honor.

THE COURT:  -- and return to counsel table.

MS. MORGAN-KELLY:  The Government calls Megan Dipatri.

THE COURT:  Come right up, ma'am.  Step in front of the chair, raise your right hand.  You'll be sworn.

MEGAN DIPATRI, GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Please be seated.  Will you please state your name and spell your last name for the record.

Dipatri - Direct                                          46

THE WITNESS:  Megan, middle initial K., Dipatri, D-I-P-A-T-R-I.

THE COURT:  You may proceed, Ms. Morgan-Kelly.

DIRECT EXAMINATION

BY MS. MORGAN-KELLY:

Q     Good morning.

A     Good morning.

Q     Where are you employed?

A     I'm employed at the Department of Homeland Security, U.S. Immigration and Customs Enforcement Office, located here in Philadelphia.

Q     What is your position there?

A     I am a supervisory special agent.

Q     And how long have you been employed by ICE, formerly U.S. Customs?

A     Approximately 18 years.

Q     And as part of your job responsibilities you investigate child exploitation crimes, correct?

A     Yes, that's correct

Q     Are you involved in the investigation of Andrew Mogilyansky?

A     Yes.

Q     And when did that investigation begin?

A     In 2004.

Q     As a result of your investigation did you have the

opportunity to interview the victims in this case?

A    Yes, I did.

Q    And, again, I won't refer to them by name, only by initial, but as part of your investigation did you travel to Russia?

A    Yes, I did.

Q    And did you go to St. Petersburg, Russia?

A    Yes.

Q    And did you meet with each of the three victims, initials M.S., E.K. and J.N., who are listed in the indictment?

A    Yes, I did.

Q    When did you travel to St. Petersburg, Russia?

A    It was in April of 2008.

Q    And where did you meet with the victims?

A    I met them also at the -- the office of the investigative -- the Procuracy's office in St. Petersburg.

Q    And how many days did you meet with them?

A    It was over the course of approximately three days, about three days.

Q    And what was the purpose of the meeting?

A    To sit in on -- actually, myself and another agent from my office went over, and we were able to interview them and obtain details of the -- the crime that had occurred overseas involving Mr. Mogilyansky.

Q    And did they describe for you their interactions with

Mogilyansky?

A    Yes, they did.

Q    Can you describe each of the victims for the Court? Let's start with M.S.

A    M.S. was a very attractive tall female, very young, dark hair, very pretty face, was extremely shy when she first walked into the room, which is typical of what we see in these victim areas.

We started out the interview, and there wasn't a lot of eye contact, which is something typically as we see, these types of interviews.  And during the course of the -- the interview there was a lot of emotion expressed, lot of looking down during the course of explaining what had happened in her interaction with Mr. Mogilyansky.

The one thing that really was quite difficult for her to speak about was that she had just turned 14 years old the very day that the crime was committed and had a very difficult time expressing that.

She was very nervous.  She didn't know me, had never met me before.  So as she had to relive that, I could sense that there was quite a bit of nervousness on her part to -- to kind of walk through the events of what had occurred.

Q    When you say a lot of emotion was expressed, can you describe that?

A    A lot of crying.  She wasn't able to look during a lot of

the -- the explanation of -- of how everything had transpired between the two -- Mr. Mogilyansky and M.S.  The eye contact just was not there.  A lot of downward-looking motion.  Her body language was very different.

Her hands were, can remember, just either holding her tissue that she would use when she needed to use it.  Her hands were crossed.  So there's a lot of closed language there, body language.

Q     You had the opportunity to also interview the director of the orphanage where these girls lived, correct?

A     Yes, I did.

Q     And would it be fair to say she had a particular fondness for this victim, M.S.?

A     Yes, she did.  They had a very nice relationship.

Q     And did she describe for you how the demeanor of M.S. changed after these events?

A     Yes, she did.  She recalled that after the period of approximately two weeks when three other girls had left the orphanage, upon the return she was very concerned about M.S.

She had pretty much withdrawn from a lot of her friends that she had typically hung out.  She wasn't the same jovial type of good-natured young lady that she recalled.  She would cry a lot.

She recalled her going -- just being in her room where a lot of times there were maybe up to six people living in

Dipatri - Direct                              50

one -- one room, but she would find her alone quite often and just crying to herself.  She was very concerned about her mental state.

Q    You also had the opportunity in April of 2008, you said, to meet with E.K.?

A    Yes.

Q    And could you describe her for the Court and describe her demeanor during your interview?

A    E.K. was very petite, also very attractive, long hair. She came in with a bit more of a upbeat spirit than I had experienced with M.S., and throughout the course of the interview it -- it was obvious that her way of dealing with explaining the events that had occurred were to -- she would cry at times, then she would talk about specifics, but then she would also giggle a little, and I think that was just the way she dealt with the type of subject matter we were talking about.

Q    And just to clarify, each of the girls were approximately 18 at the time you talked to them.

A    Yes, that's correct.

Q    And you also met with J.N.?

A    Yes, I did.

Q    And could you describe her for the Court?

A    She was also very -- this was her first time being interviewed, and so she was a little different altogether

because you could sense the nervousness of how this process was going to be, which, in and of itself, is difficult.

And she's, again, very attractive, very petite build, not very big stature. She was, at first glance, seemed very easygoing, and she eventually got very comfortable with us during the course of -- of the interview.

She also displayed signs of emotion and expressing that this had been first sexual experience for her, and so at that point where she was describing it she was extremely upset. Showed signs through crying. She also displayed some of the downward-looking motions. It was difficult for her to talk of her first experience and with the type of situation that she was in.

MS. MORGAN-KELLY: I have no additional questions, Your Honor.

THE COURT: All right. Anything, Mr. McMahon?

MR. McMAHON: No questions.

THE COURT: All right. Thank you very much, ma'am.

THE WITNESS: Thank you, Your Honor.

THE COURT: Watch your step, and you may step down.

THE WITNESS: Thank you.

THE COURT: Thank you.

MS. MORGAN-KELLY: Your Honor, at this point I would like to read the written statements I received from the victims.

THE COURT:  All right, ma'am.  Go right ahead.

MS. MORGAN-KELLY:  May I use the podium?

THE COURT:  Sure.

MS. MORGAN-KELLY:  Your Honor, the first statement that I would like to read is from M.S., and I -- and I won't trouble the Court to read the questions that were posed.  I know the Court's had the opportunity to see those.  I will simply read through the answers to expedite matters.

The statement of M.S. is as follows:

"After this rape I was aching all over.  It was painful for me to walk, but my psychological damage was greater.  I started very much fearing men, guys.  I felt as though they wanted only one thing, only sex with me.  When, after this day in Moscow, I was taken into a foster home, I felt as though my foster father would rape me if I'm left alone with him.  I became very nervous, jittery.  I changed my opinion about all the men.  I think that all the men have a one-track mind.  It's very hard to live with it.  Mogilyansky is is the worst kind of scum.

"Before this crime I was a cheerful, kind, trusting child.  Now, that is to say after this, my opinion and my aforementioned qualities became totally different.  I became very irritable, distrustful, and if a young man says that he loves me, I don't believe it.  I don't believe that the man is capable of loving.

"Yes, this crime has greatly affected my personal life. It was hard for me to take a grip on myself and to reciprocate the feelings of a young man whom I loved. I was very much afraid that some day I would have to make love because, through the fault of Mogilyansky, I retained very bad memories and feelings. I still feel his repugnant breath. I hate him. But thank God I came across a very good man. He explained and showed to me that he is different, and thanks to him I feel much better, but a certain fear still remains."

And, Your Honor, I would like to read the victim statement of E.K., which is as follows:

"It happened in 2003. Of course, I was in shock after that because I didn't want it. It was by force on his part. He made me do it. Members of my family reproached me. Even now I still have problems communicating with them. Naturally after that I had fewer friends because of that occurrence. I became ill-disposed toward the male sex. I couldn't communicate with them, let alone have any kind of relationship

"Yes, I talked with a psychologist. My results were bad because on account of that Mogilyansky I became nervous, unsociable, withdrawn and psyched out. Even almost six years after that already I still think back to it because it's impossible to forget this."

She was asked how her feelings were changed, and she responded:

"They have changed.  I became unsure of myself.  I became jittery.  I don't want to even think about it or to remember.  Currently, I don't work, even though I wanted to in the past, and now I don't even have an inclination for it.  I have everything fine with running a household.  Everything is still bad at school because the same people study there who used to live with me at the orphanage, and they all know about what happened, what Mogilyansky did.

"Yes, I used to do drawings, and now I don't even feel inspired.  Also, I used to go to all kinds of hobby groups, sports, knitting and so forth.  I don't want to be involved in this because if I am going to do all this, I'll be remembering again what Mogilyansky did, and I want to leave all that in the past, as hard as it is."

Thank you, Your Honor.

THE COURT:  Thank you.  All right.  And I take it, Ms. Morgan-Kelly, no further evidence on your part.

MS. MORGAN-KELLY:  No, Your Honor.

THE COURT:  All right then.

Mr. McMahon, I'll hear from the defense side.

Mr. Mogilyansky -- would Mr. Mogilyansky --

MR. McMAHON:  Yes, Mr. Mogilyansky is going to --

THE COURT:  -- like to go first?

MR. McMAHON:  -- exercise his right now to --

THE COURT:  Sure.

MR. McMAHON:  He can go to the podium or right where he's at?

THE COURT:  He can stay right where he is, sir.

MR. McMAHON:  That's fine.  Okay.

THE COURT:  And you can sit or stand, wherever you're more comfortable.

THE DEFENDANT:  Your Honor, I wrote, as you know, a letter in which I tried as best I could to tell you what I think and how I feel about this, and I'm sure you have read it and thank you for that.

I would like to take a few minutes to say a few things, some of them, in addition to what I said in the letter.

THE COURT:  Sure.

THE DEFENDANT:  I made a disastrous decision. There's no question about it, and I did horrific things back in 2003.  There is absolutely no excuses, reasons or anything that I can even try to think of.  This is the worst -- by far the worst thing that I have done and by far the worst thing that anybody has done that I know.  I don't know anybody that has done a worse thing, and it's a tough thing for me to say. That's not the way I thought of myself before that, and it's

going to change forever how I feel about myself.

This was done out of selfishness and thoughtlessness that I didn't used to attribute to myself, and that I now realize I'm capable of, that I'm capable of creating an excuse in a selfish moment for myself, not realizing what the consequences of my actions will be for others.

I've never -- I'd never thought of that before that, and I didn't think of that at that time, and if I did, this wouldn't have happened. You've heard from others what kind of person I am. This is not -- this isn't me, Your Honor.

The disastrous consequences of that thoughtlessness and that selfishness are -- are obvious, are -- and victims -- and victim impact statements and the fact that I'm hearing this now, and I've heard about how they have felt, I'm ashamed to say that the time that it happened, even though I -- as you know, I've confessed to my wife and, you know, the -- for five years I've led a decent life.

I am ashamed to say that in addition to not thinking of it then when I did it, I didn't think of it for five years. I didn't think of the harm that I caused them, and even though I analyzed what had happened, that part of the analysis I didn't go into, and it's -- I would love to tell you that it wasn't so, that right after that I thought, "Oh, my God, what have I done." I didn't, and it wasn't until after I was arrested that I had looked at myself in the mirror and said,

"How could have I done this?  How could have I created excuses to do such a horrible thing?"

It is one thing to create an excuse for yourself to, I don't know, go and have a drink, but you create an excuse for yourself, and you don't think, and the results are the same as when you make an intention to go and kill somebody and shoot somebody.  The -- that person doesn't know the difference.  For that person it's the same, whether or not you've created excuses for yourself, whether or not you went after that specific person.

I -- I'm not a shallow person.  I understand that. And I'm also not a person that looks at himself and says, "I'm fine with who I am."  I've learned lessons.  I -- for the past ten months I'm having daily conversations with myself about what happened, as you can obviously imagine, and there is no -- not a chance that I can ever possibly fall into the same -- into the trap of creating excuses for myself and doing something that would hurt others.  I will always forever for the rest of my life think before I do anything, what -- who else can this affect, how will it affect them, what the consequences are, and I would never do something like that.

And, again, what -- what I have done outside of this should tell you that I did -- I do -- I do this -- I would not go and intentionally harm someone.  And having listened to these victim impact statements -- I read them, but it's not

the same as listening to them just now -- having heard from the Government and from the documents produced in the last ten months what this has done to them, what it felt like at the time, I am not just sorry.  I am not just remorseful or apologetic.  I am -- if -- if I could put my life today to make their lives better, I would -- I would give up my life for this to go away from their family, from their memories forever.

But I -- there -- there's no -- you can't undo things.  If there was a time machine, then FDC would be empty. There's no -- everybody always says, "I would love to turn time back."  I can't turn time back.  There is nothing I can do, and the things that are in my power, as you know, I have done all of them.  I have -- guilty, I have done other things that no -- that hopefully will take at least some hurt or some potential hurt off the victims, and I certainly recognize what I have done.

And I -- when I decided to plead guilty -- we analyzed the case with Mr. McMahon up and down, and at some point I told him, "You know what, stop.  I did this.  I deserve the punishment.  I'm not going to fight because I did it.  I am guilty.  There is no -- I -- I don't want to try to avoid something I deserve, because it is the responsible thing to do."

And it took me time to convince Mr. McMahon to -- to

enter my guilty plea because he initially wanted to fight, and I said no. "No, there is no fighting. I -- I did this. I have to plead guilty." That was the main reason. Not the risks, not the embarrassment. The main reason was that I was guilty, and the second reason, as -- that convinced him is I said, "I don't want to hurt them anymore. I don't want them to come here. I don't want them to have to relive this. This cannot be a good thing for them under any circumstances."

And I -- it would be insincere of me to say I would like to minimize the harm, which I -- and at the same time I would like for them to come -- so I'm very sorry to the victims. There is no -- no words that can express my sorrow. There's no -- there's no words that exist in the language to express how -- how sorry I am that this all happened to them, that I caused this, that I did this, and that people like me who create the demand for this cause to others like them, and that continues.

And as Ms. Dipatri and the agent say, their job was to look for things like that. That means they continue to exist, and people like me don't realize that they are the reason, and they're inventing the same excuses and the same reasons as I did in 2003 for themselves or -- or more to do what they do.

If there were no Andrew Mogilyanskys, there would be no -- because there would be no -- there would be no -- no --

none of this would exist, and I'm the -- I'm the -- as I said, I'm the one that did the worst thing that anybody I know has done, and I'm very sorry for that, and I.apologize to the Court, and I apologize to the Government for this.  I sincerely do.  And there's not a chance in the world that I can ever invent a reason for myself to -- there's -- there's no chance.

I wanted to briefly say that I thank God that I have the friends and the kind of family that I have that are standing by me that, you know, many of whom are here today, many of whom wrote letters to Your Honor, especially my wife.

I would like to say that I'm in debt to you forever, Aksanna, and I -- I cannot -- I cannot say -- she's victim of this conduct, as well, and, you know, we've worked with her to reconcile, and that's since 2004, and like the other three victims, and as you know, she has forgiven me, and she's sticking by me, and considering the nature of the charges, it has -- I'm thank -- thankful very much to her and to the -- that I have a wife like her.

I thank my friends and everybody that came here to -- to be with me today.

I also would like to say something that I learned, I thought of only yesterday.  Yesterday an inmate on 7-South, the -- told me that his 76-year old father died while he was there.  He learned of it from his ex-wife, nothing from his

brother. He hasn't spoken to his father or his brother ever since he was arrested. He has not been in touch with them. He doesn't know their phone numbers. He didn't speak to his brother for a year before his father's death. His closest family member is his ex-wife who he divorced ten years ago. He has nobody.

I have everybody who came here today and more. I have my family. My wife and I resolved to do something that we think is rather unique. We resolved to maintain what we can informational and emotional unity. We speak several times a day for a minute or two. We write daily letters to each other.

I know that my twins were at a farm the day before yesterday and were picking out chicken eggs from -- from nests. I know that my one-year old Julia likes, you know, three days ago at Jersey Shore was picking up seashells and ended up eating them. I know that my wife bought shoes at Kmart for buy one, get one free sale yesterday for one of our kids. She knows what I have for breakfast because there's a new item in commissary. We are one family. We live as a family. We are separated physically, but we are a family, and I have that to come back to when I'm released, and this will continue every day for the time of my sentence.

I give Your Honor my word that you will never hear anything back about me ever again. I will never do anything

bad in my life.

Thank you very much.

THE COURT: Thank you very much. Thank you, sir.

Mr. McMahon.

MR. McMAHON: Yes, Your Honor. May I make argument to this Court at this time?

THE COURT: Please do, sir. Certainly.

MR. McMAHON: I'm going to need the podium.

THE COURT: Certainly.

MR. McMAHON: If Your Honor pleases, you have been the beneficiary of a huge amount of information here, a sentencing memorandum of attached documents that's larger than I've ever presented to any Court anywhere in 32 years of practice. But I think it's not just the quantity, although that is relevant, of information and -- but I think it's the quality of the information that is even more important.

We are here as a Court and lawyers and a Judge, and there is emotion on both sides. There's emotion from the victims and emotion from family members and the defendant. But we as a Court and a judicial system, as best we can, have to try to take some of that emotion out of the equation. Some of it is valid in determining the right thing to do, but we have to be a little more objective.

And one of the things that has led Courts to that objectivity is the sentencing guidelines in an attempt to do

that.  In reading the sentencing guidelines last night in the beginning, which I never really read the beginning of it and the mission statement or whatnot, some of that is the -- the goal of that, to try to -- disparity of sentencing, emotion and one Judge thinking this about a particular case and another Judge thinking that about that same particular case.

So I was thinking as I reflected on what to say to this Court as to we are here with a legal analysis, first and foremost, at the time of sentencing, and we are left, because of the negotiated plea in this case and your acceptance of it as a C-plea, which gives us a guideline of 78 to 97 months.

Now, that's a 28.1, which gives us rise to that. And I was thinking why is there a -- a guideline range, why isn't there just a number.  Why is there not just 80 on a guideline range?  Well, obviously, the reason is that all 28s, so to speak, are not created equal.  All 28s are not the same.

Now, the guidelines in this case that got us to the level of 28 have taken into consideration much of what has already been said by the Government and the facts of this case.  The guideline has taken in effect the age of these victims.  The guideline has taken the fact that there was actual sex.  The guideline has taken in fact their vulnerability by way of an orphanage.  He's been enhanced for this, and we get to this number of 78 to 97 -- with all those factors bringing us to this 78 to 97 months.

Defendant - Argument                                     64

And the guidelines were set for equity in sentencings, and they set this range -- range of 78 to 97 for all violators similarly situated with those enhancements of age, orphanage, sexual activity taken into place.

Now, after we establish that as a legal proposition, after we establish this guideline, which is taking all these various factors into consideration, I think the legal question that this Court is faced with is where does this defendant, this defendant, Andrew Mogilyansky, where does he fit in that continuum that goes from 78 to 97 months. Is he the worst 28 that could be imagined with a person similarly situated, or is he the best 28 of people similarly situated with the guideline factors taken into place? And that's why there's a range, and that's why it's not just one number.

And if we analyze where this particular defendant would fall in that continuum based on certain factors that are ones that we are to intellectually analyze, I think it's an easy question. Sometimes they're not easy questions. Sometimes it's -- it's vague as to where the person falls within that continuum.

In this particular case, and I'm going to talk about these, Your Honor, is, one, the plea, the fact that he minimized the Government the effort and experience. He minimized the trauma and stress and emotion to the victims, and I'm going to talk about these each in just one second,

Your Honor, 'cause I think it's important.  The incidents themselves were an aberration in an otherwise remarkable life. It was six years ago.

You heard the psychologist, Dr. Samuel.  You heard from the testimony in the back what -- what he did to make the -- the victims whole again.  You heard about his background and coming as an immigrant to this country, not being able to speak English and going to Columbia University.

You heard about he's an intelligent, thoughtful and reflective man.  He's an excellent father and family man.  You heard about the charitable work.  You heard from 89 letters of people, and you heard from extraordinary remorse.

In dealing with those issues, Your Honor, it seems to me that if that -- if that does not qualify as the best -- best 28 or at the low end of the range that is set up by the guidelines, it's hard -- I'd be hard-pressed to imagine the person that would fit that category or that characterization.

And just briefly, Judge, in looking at this plea, and I think it's important to note, and I'll agree that -- as I said, those factors of the vulnerability and whatnot have been placed into the guideline, so has the fact that he's pled.  There are points taken down, and obviously I can't, one hand, say that it's been factored in, on the other hand say that try to take an advantage.

But I think that in this particular case, rather

than maybe some drug case or some other case where a plea, as we say, minimizes the effort of the Government, this one extraordinarily minimizes the effort of the Government. As Your Honor's well aware, the case -- we had talked about going to Russia in this case and having depositions over there and the cost and expense and effort and -- and whatnot, that was all eliminated by his early and quick guilty plea in this matter. So it's an extraordinary savings to the Government and the people in this case.

Again, as to the victims, I mean the -- again, unlike other cases, the minimization to the trauma and stress and emotion to them is even more extraordinary in this case because these are young girls that not only would have to come and relive an awful experience, but they would have to travel from one country to another country under all that, testify in a foreign land about things they don't want to testify about in the first place. And to eliminate that I think is an extraordinary minimization of the damage that he's already candidly admitted to.

These incidents, Your Honor, are -- are -- you know, you hear the word "aberration," and we use it in legal terms, but it seems to me that this conduct back in 2003 and early 2004 was just that, an aberration.

I was reading last night again -- and I'm not suggesting, as we know, that there's no -- can't downward

depart, but, nonetheless, the language in the 5K.20 about aberrant behavior was -- I think it was illustrative to me in some way in analyzing it.

They talk there about the mental and emotional condition of the defendant.  Well, you heard about that from Dr. Samuel.  They talk about the employment.  This is the notes that talk about it, the employment record.  The record of good works, the motivation of the crime and the efforts to mitigate the effects of the conduct.

And if you look at those factors in the notes of 5K.20, aberrant behavior, you will see that, although we're not asking for a downward departure, obviously, 'cause we cannot, but you would see in this that it certainly has the ring of aberrant behavior as specified in 5K.20.

And one thing as  judge is -- always, as Dr. Samuel said here today, it's -- no one can predict the future.  I mean could Andrew Mogilyansky turn out to be something that none of us expect?  Of course, of course.

And Judges are always at some point in time trying to predict the future, what's going to happen in the future, and -- but in this particular case, Your Honor, besides all the testimony that you have that you can base your prediction, so to speak, of future conduct, you have the past to show us that.  You don't have to speculate.  You don't have to guess.

This happened in late 203 [sic] and 2004.  My client

Defendant - Argument                                    68

was stopped at an airport in July of 2004 and made aware of the investigative process that was going on. He was under the scrutiny and eye of ICE since 2004, and -- and up until this date this man has done absolutely nothing under the scrutiny that he has been in for almost six years, Your Honor.

So you don't have to guess whether he's going to do this again. You know he's not going to do it again, and it doesn't have to be from your belief of testimony. It can come right from the their own facts. You know, it's like betting horses. You know, you look at their track record and you look at what they did in the past to determine your -- putting your $2 on them. Well, I think that his track record over the last five, six years has shown to you and should show to you that he's worth putting that $2 on.

You heard from Dr. Samuel, and I thought initially when -- that every Court would want to know in this case what we presented Dr. Samuel at our expense for because we all know pedophelia is a -- is a problem that, by all accounts by psychologists, can't be cured, and it's a repetitive problem. So I think that we -- we confronted these issues because obviously, 'cause of the nature of this crime, and you found that he's not a pedophile. He is not a predator. He's not a risk of future offending, and you also know this as I previously indicated by the past six years.

And I found it curious that the Government questions

Dr. Samuel at all because, as you know, we had this report -- and Dr. Samuel and the Government knew the nature of this case long ago, and if they felt as if there was some sexual predator aspect to this case or some pedophelia aspect of this case, I can tell you that I would think that in their responsibility to the citizens of the United States that they would have obtained their own psychiatric evaluation of Mr. Mogilyansky, which I'm sure this Court would have ordered, for purposes of demonstrating that the he in fact is a pedophile and he is a predator. They have chose not to do that. They have chose not to do that.

They could have gotten Dr. Samuel's report and chose to hire their own expert to contest that findings of Dr. Samuel. Actions speak louder than words, Your Honor, and they chose not to engage in that because I think they know that Dr. Samuel is correct, that he is not a pedophile, he is not a predator, and he is not a risk of future sex offense.

You also heard about, in the back, we presented testimony in the back, and what I suggest that testimony shows to Your Honor, his respect for the victims and the minimization of trauma, and I think it's extraordinary minimization.

You heard the speed of which all that got done. You heard about the efforts that the defendant made to get it done. You heard about the efforts he made to effectuate it

after it was already done in a rapid and fast way.  That, to me, Your Honor, is -- as many people have already said here today, you can't turn back the hands of time.  You can't change 12, but you can change 12:30.

And what Mr. Mogilyansky did in this case, from what you heard there, was attempt to change 12:30.  He attempted to make the lives of these people he victimized better in a way which minimized the trauma, the emotion and gave them some potential for a better life and hope in the future.

You know, when I was kid, my father used to always tell me all the time if I did something wrong, that, you know, "You''ll do wrong, you'll make mistakes, Jack.  But the true measure of a man's character is what he does after those inevitable mistakes."

And so the true measure of Andrew Mogilyansky is one of a remarkable, remarkable reflection, understanding, remorse and change.  And that is what speaks to the measure of his character, as how he handled his fall from grace, so to speak. How did he handle it.  What steps did he take?  What did he do under those circumstances?  Did he blame other people?  Did he make excuses?  Did he try to hide it?  No, he didn't, and I think that speaks volumes as to what you've already heard about Mr. Mogilyansky.

Mr. Mogilyansky's an individual who came here, as I said, without able to speak English and went to Columbia

University, and as reflective of that Jesse Jackson line of being somebody.  He became somebody.

He didn't just wallow, he didn't just come to this country and -- he came to this country, became a United States citizen and took advantage of the beauty of this country and has contributed to the beauty of this country by his education, his family, his business and whatnot.

This is an individual who's intelligent, thoughtful and caring man.  He's an excellent father.  He's an excellent family man, and, yes, he's an excellent husband, and that's hard to say in a case like this where a guy cheated on his wife, whether it be through a escort service or an affair. And I say that only because of what I heard from Aksanna and from the defendant and his letter, and that is sometimes -- I've heard the old saying that the strongest weld on a pipe is one that has been repaired, that has been broken and been fixed again.  That's the strongest weld any plumber will tell you on a pipe.

This was something that may have been broken, but it has been welded, and we have now a strong connection between Mr. Mogilyansky and his wife.

You heard this charitable work, Your Honor, and it's documented, and I'm not going to reiterate it.  You saw it. You saw videos.  You saw letters.  You saw letters signed by a number of people, and it is, to me, remarkable. This was done

Defendant - Argument                                           72

by Mr. Mogilyansky on his own.  He wasn't prodded into it.  He wasn't asked to do it.  He did it by himself.  He was self-motivated to move himself in this direction when lots of people just stand by, lots of people -- we see it every day.  We all see it every day, things happen, and we all -- most of us sit on our hands, and maybe if somebody comes to our door, maybe we'll give them $20.  Or maybe if there's some real tragedy, somebody knocks on your -- to your office and says, "Can you give $50 to the Red Cross," or, "Can you give $100 for the Katrina victims," and out of obligation you do it.

But that's not what Mr. Mogilyansky did.  He saw a problem.  He took action, and he took extraordinary action, effort, time, all the various things that you've heard, and -- and helped people tremendously.  You heard from the people that he helped.  I don't have to reiterate it.

This displays an aspect of this man that is nothing less than magnificent in his way he has presented himself.  You know, there -- my wife has a saying somewhere in our -- in our bathroom that the good life is leaving the world just a little better than when you -- because you lived, leaving it just a little bit better.  We're not all going to make major effects on everybody in the world.  That's not the way life is, but if you make a good life by leaving the world just a little bit better because you were alive on the planet.

Well, Mr. Mogilyansky made some people's lives a

little bit better just because he was on this planet, and he made those girls and children in Beslan and Nord-Ost just a little bit better. He made their lives easier when they were confronted with such a tragedy, and these families have told you just what it is they've done.

You've seen 89 letters presented about this man, a remarkable amount of letters, and I felt obligated as his attorney to read them all, and it takes time.

We had people come from Florida, Virginia, and these letters struck me, as I read them again last evening, that they're all independent of each other. This wasn't everybody sat in a room and said, "Okay. Let's write about Andrew Mogilansky." They're all written either in their homes, at their offices, in Florida, in Virginia, in New York. All these various places people decided to write their own letter individually.

And when you read them in totality, there's a common thread that comes through all of them when they individually write, and the words that kept coming through as I notated them last night, as I reviewed this, is "caring, committed, generous, kind, intelligent and hard-working, tremendous family man and tremendous friend."

How does it come to be that all these independent letters reflect the same things? There's only one explanation. Because it's true. Because it's true.

The Government in their sentencing memorandum talks about the defendant as this -- when they see -- they anticipated this extraordinary amount of support for Mr. Mogilyansky, they choose to explain this in a way that I suggest is illogical and unfair.  They attempt to explain it by that Mr. Mogilyansky engaged in conduct that was to deceive these 89 people.

Well, Your Honor, first of all, the charitable work that he did had no reflection on any of the acts that are done here.  It was not done with an attempt to deceive anybody.  It is what it is, and what he did was what he did.

But, more importantly, Your Honor, every letter that you read, 89, and all the people here in this courtroom that you've seen come, take time out of their daily lives and schedules and work and inconvenience, every one of them is aware of what Mr. Mogilyansky admitted to.  Every one of them knows what he pled guilty to, and every one of them has -- has been standing by him completely because they know Andrew.

There's a big difference between deceit, Your Honor, and disappointment.  Bernie Madoff deceived people.  But I think best said about Mr. Mogilyansky is that he disappointed some people.  There's a big distinction there.  Friends are disappointed in his human failures, but they have not been deceived.  They know everything about this man, and they're still here and extraordinarily supportive.

You've heard what I suggest is extraordinary remorse. You have the defendant's letter, which is one of thoughtful and reflective of a very intelligent man coming face to face with his own -- his own reality, that he isn't all that one -- that he thinks as. We all think of ourselves as good people. We generally do, and -- but there's times when you have to come face to face with maybe you're not as good as you think you are, or that you perceive or you let out other people to be, and that's what I think he's had to come face to face with.

And reading his letter and talking to him shows an incredible insight and reflectiveness that I think many men don't engage in. He didn't try to excuse it and ramifications of -- rationalize it in any way, shape or form. He didn't try to blame others. He confronted his own character flaws honestly and moved forward and changed to be better, and he's recognized clearly the selfishness of his acts and how they affected the victims, foremost, but also his family and his friends.

He has indicated through what we talked about in the back, an incredible statement of "I'm sorry." You've heard how many defendants come, stand right here and say, "I'm sorry, Judge, I'm sorry. I'm sorry." It's not a hard thing to say. It's very easy to say.

But I think through the defendant's conduct, his

actions, both in the -- the quickness of the plea, the minimization of damage to the victims and what we talked about in the back, "I'm sorry" is more than just words for Andrew Mogilyansky.

So, Your Honor, not take much more of your time. Again, going back to my beginning analysis, back to what I started in the beginning was we as a judicial system attempting to fashion the proper sentence with a guideline range, if after all I've said to you, after all you've read and after all you heard with these people, Mr. Mogilyansky is not a 78 or the low end of that guidelines, I can't even imagine who that person would be that would fit into that range.

Thank you very much.

THE COURT:  Thank you very much, sir.

Ms. Morgan-Kelly.

MS. MORGAN-KELLY:  Thank you, Your Honor.

The offense level is a 28, and that provides you with a guideline range of 78 to 97 months, but once you have that range, Your Honor, you have to consider a variety of factors under Section 3553.  The nature of the offender is one of many factors that you need to consider, and that is what dictates where you come out in that range, and that -- all of those factors are why the Government is asking you for a sentence of 97 months.

Government - Argument                                    77

We have heard a great deal about the nature of the offender, that one factor. We've heard about his extreme intelligence. We've heard about his generosity, his charity. We've heard about his interactions with his family. The Government doesn't deny any of those. It's all extremely impressive, and it's one factor that the Court needs to consider.

But let's think about the other factors. The same guy you heard about who did all of those wonderful things is the same guy who, on cold nights, definitely cold nights, in December of 2003 and January of 2004 was sitting in that car outside the orphanage, waiting for a 13-year old to be brought out, not one time, not two times, but three times, three different times, letting a little girl get in his car with his driver and being taken to his apartment in St. Petersburg so that he could have sex with her.

These girls were living in an orphanage. Three of them, three separate people.

Defense counsel says actions speak louder than words, and the Government didn't get its on psych evaluation. Actions do speak louder than words, Your Honor, and those were the actions of this defendant in 2003, three separate times. We are talking about 13-year old girls, and as Special Agent Dipatri testified, one on the day of her 14th birthday.

We're talking about seventh graders, Your Honor.

That's what a 13-year old girl is. It's a girl in seventh grade, a girl who, in -- in most cases hasn't even come into contact with a boy her own age, let alone being exposed to statutory rape by an adult male.

The people closest to him who've said all these wonderful things, who obviously were sincere in their remarks to you, had no idea that any of this was happening. What does that say about this defendant? What does that say about his capacity for deception? Even in his own letter to the Court he admits he thought he could get away with what he was doing 'cause it was over in Russia. He thought that was like a free zone where he could engage in any kind of conduct that -- that would be offensive to his wife.

The supposed expert that he relies upon sat right there and told you basically his entire opinion is based on what Mr. Mogilyansky told him about Mr. Mogilyansky. That's where he's getting information and from these people who had no idea any of this was happening.

He also told you that 100 percent, one hundred percent of the time he has testified for the defense.

I read in the materials that the defendant has made efforts toward rehabilitation. Where is the psychological treatment? We have a sex offender who on at least three separate occasions engaged in sex with seven graders, untreated. He has had no psychological treatment. He's an

untreated sex offender.

Mr. McMahon spoke about betting on horses.  If a horse goes in a race and wins it three times, I'm going to bet he's going to win again.  Three separate times he engaged in this activity.

Defense counsel talked about minimizing the efforts of the Government.  Well, Mr. Mogilyansky already told you in his letter he did this overseas thinking that it was a separate world where he wouldn't be held accountable for his actions, and that certainly complicated this investigation for the U.S. Government.  This investigation occurred over the course of five years and required intensive interaction with the Russian officials.  We were at their mercy to get access to the victims.  We were at their mercy to get access to the evidence in this case.

The victims had to be interviewed five years hence and recount all of these events, and you heard from Special Agent Dipatri how difficult that was for them emotionally and the shame that they displayed and the humiliation they displayed during those interviews.

And I'm sure the Court has read in paragraph 12 of the presentence report about the evidence of efforts to evade apprehension by the Russian authorities.  So in no sense of the word wad there a minimization of effort of the Government. Certainly, Mr. Mogilyansky has since pled guilty, but a great

deal of effort by a great number of persons went into this case.

The sentence needs to reflect the seriousness of this offense, as the Court knows, promote respect for the law, provide just punishment, afford adequate deterrence to other people, and there are plenty of them who would consider going overseas to have sex with minors where they think there are no repercussions, just like this defendant did.

Protect the public, provide treatment, avoid sentencing disparity, and certainly the Court is aware of defendants who have received decades for this type of conduct. How will each of those factors be addressed, Your Honor, in fashioning a sentence?

You have had plenty of people before the Court, undoubtedly, who've had no resources, no money, no family, no one cared about them, no one was there for them, and in those circumstances you can almost see how the person became so hopeless that they turned to crime, but that's not this defendant.

This defendant told you himself he has the support and has had the support of so many people.  He was married to his wife who he described so beautifully at the same time this was happening.  He's had financial resources beyond the realm that most of us can even imagine, and still, still this is what he decided to do.

Defense counsel says that in some cases you might feel deceived, but in this case it was disappointed, that he disappointed people. There's another word to describe what he did. He devastated three people, three very specific people in St. Petersburg, Russia.

You've heard about a lot of children in this case. You've heard about the defendant's precious children who undoubtedly are victims, very innocent, fragile victims of this offense as the result of their father's selfishness. You've heard about all the children who were helped in the charity, who undoubtedly were each precious souls who were victims. And there are three precious souls in this case, Your Honor, three victims who suffered. You can't see them. They weren't brought here to relive that experience, but you've heard about them from the agents, and you've read what they had to say about how still they are damaged, how ashamed they are, how humiliated. Even now.

They were in an orphanage. Their families discarded them. Don't discard them, Your Honor. The defendant needs to be punished. The public needs to be deterred and protected. Make the suffering of those three innocent souls matter.

Thank you.

THE COURT: All right. Thank you very much.

We'll take a ten-minute recess.

THE CLERK: All rise.

Decision of the Court                                   82

(Recess taken, 12:33 p.m. to 12:46 p.m.)

THE COURT:  Thank you.  Please be seated, everyone.

Never have I had to sentence someone whose life apart from his crimes seem so very different from the crimes themselves.  I would have thought that the man who helped so many children after the Beslan attack could not have physically and psychologically injure children as the defendant did to these three young teenagers.

The psychological report from Dr. Samuel and his testimony, which -- which I do accept, by the way, I was impressed with Dr. Samuel.  But that report does not really explain the phenomenon that I just described, and it -- of course, it wasn't intended to, and I certainly cannot.

But I must look at all these different aspects of the defendant and decide on a sentence that is sufficient, but not greater than necessary to meet the goals of sentencing.  And, of course, both Mr. McMahon and Ms. Morgan-Kelly have gone through the factors of 18 USC Section 3553(a).

We start with the nature and circumstances of the offense and, of course, the history and characteristics of the defendant.  The offense, victimization and exploitation of 13 and 14-year old girls who have been abandoned by their parents and have been living in an orphanage.  To take young teenagers from that orphanage to an apartment and have sex with them is a grave criminal act.

The victim impact statements show what I think is probably obvious to everyone, that taking children of that age whose sexual identities have not yet been fully formed and to do that to them can be even permanent harm, I'm sure.  Their lives will be different because they were harmed by Mr. Mogilyansky.

I have to consider, of course, Mr. Mogilyansky himself, and I did read, as Mr. McMahon said he did, every word in this binder.  I did look at the DVDs, and it is an amazing story of effective charity from everything I could tell.  Mr. Mogilyansky helped so many people, not just with money, but with his time and tireless efforts, and he -- he must be commended for that.

I understand -- I also accept that Mr. Mogilyansky, from what we discussed, as Mr. McMahon has referred to it, "in the back," has certainly attempted to minimize the injury to the -- the three victims.  I accept that.  I appreciate the fact that he did that.

I also accept Mr. Mogilyansky's remorse.  I have no reason to doubt, and certainly the life he has lived before and since these crimes supports the fact that he is very remorseful for what he's done, and that it is very much out of character with the person who is presented here today, by the witnesses that Mr. McMahon presented and, of course, by all of the letters that I did receive.

The other factors, though, as Ms. Morgan-Kelly stressed and the Court must consider them, as well, the need for the sentence to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense.  This sentence must reflect the very seriousness of this offense.  It is a grave offense.

And also appropriate punishment.  I appreciate that Mr. Mogilyansky has tried to make amends, and I think that certainly even before the investigation started he, of course, was working with his foundation to try to help the victims of terror.  And I'm sure after it he in some ways perhaps, I hope, is trying to make up for what he did, but he -- there must be punishment.  There must be deterrence to others.

This -- this business of going abroad to have sex with young girls is -- is just -- is just an awful situation. So there must be deterrence for others, as well as for Mr. Mogilyansky, although I do accept Dr. Samuel's testimony, although, of course, there are admitted limitations to knowing what the future will bring, but I -- I would hope that Mr. Mogilyansky does -- the public does not need to be protected from him anymore, and that he will not again commit crimes.  I have to accept that, based on everything I've heard.

I also have to consider the need to avoid unwanted sentencing disparities, restitution, which I think is not an issue in this case.  There has been an agreement as to that.

And, of course, I consider the guidelines, the stipulated range that has been given to me, and, of course, I must sentence Mr. Mogilyansky within that framework.

When I put all of that together and try to balance a very complicated individual, I do think that the appropriate sentence is 97 months, and I say that because the history and characteristics of the defendant apart from this is very, very impressive, but so is the nature of the crime, and I think it really doesn't balance out, as far as I can tell.

So that is the sentence that I propose to give in terms of incarceration.

We did not discuss some of the other elements of a sentence before, and I would like to discuss that now before I impose sentence.

Supervised release.  Is there a -- do people want to express a view on that?  It is -- I understand that the guideline range is five years to life.

Ms. Morgan-Kelly.

MS. MORGAN-KELLY:  Your Honor, in -- in these types of cases we consistently request lifetime supervised release, and I would request that.

THE COURT:  And, Mr. McMahon, your thoughts.

MR. McMAHON:  Judge, I think as you indicated and we've indicated here, the likelihood of any recidivism is extraordinarily low.  I think five years would be sufficient.

THE COURT: Well, I think I'll do 15 years of supervised release.

Now, a fine. I -- we talked about some issues in a sense relating to payments by Mr. Mogilyansky, but the fine guideline range is 12,500 to $125,000. Does anybody want to be heard on the fine?

Mr. McMahon.

MR. McMAHON: Judge, considering all that you've heard, both in the plea agreement and other testimony that you've heard as to the financial stretch of this defendant, that I believe that the low end of that guideline would be sufficient --

THE COURT: Was there an --

MR. McMAHON: -- under all circumstances. 1

THE COURT: There wasn't an agreement in the plea agreement, was there?

MR. McMAHON: No.

THE COURT: Did I -- okay. I didn't think so.

MS. MORGAN-KELLY: No, Your Honor.

THE COURT: Ms. Morgan-Kelly, did you want to be heard on that?

MS. MORGAN-KELLY: I agree with what Mr. McMahon said.

THE COURT: Okay. That will be $12,500 for the fine. The 5,000 per victim had been part of the plea

agreement --

MR. McMAHON:  Yes.

THE COURT:  -- which is $15,000, $400 special assessment.

Now, conditions of supervised release, and I will just say that the Probation Department has given me several options and -- but let me start with you, Ms. Morgan-Kelly. What conditions of supervised release, if any, in addition to the standard ones would you request?

MS. MORGAN-KELLY:  May I have a moment, Your Honor?

THE COURT:  Of course.

Let me just ask.  As I understand it, Mr. Mogilyansky is a United States citizen.

MR. McMAHON:  Yes.

THE COURT:  There are no ICE issues, are there?

MR. McMAHON:  No.

THE COURT:  No.  Okay.

MS. MORGAN-KELLY:  Your Honor, a standard condition when we have contact offenses is that the defendant shall have no unsupervised contact with minors, other than his own children.  So we would request that condition.

THE COURT:  All right.  Any objection to that, Mr. McMahon?

MR. McMAHON:  No.

THE COURT:  All right.  And I think it is a

requirement that -- that Mr. Mogilyansky register with the state sex offender registration agency.  I don't think that's --

MR. McMAHON:  That's not an issue.

THE COURT:  -- within my discretion.  Cooperation in DNA is not within my discretion.

Is there any other request?  Ms. Morgan-Kelly.

MS. MORGAN-KELLY:  No, Your Honor.

THE COURT:  All right.  And in terms of request for designations or anything --

MR. McMAHON:  Yes, Your Honor.  I have a --

THE COURT:  -- Mr. McMahon?  I think you asked me for Fort --

MR. McMAHON:  Judge, I have a --

THE COURT:  -- to designate Fort Dix?

MR. McMAHON:  I have a -- I have a -- I could pass up to the Court what I would ask the language to be reflected on your order if in fact possible, and it is that we're asking that the Court strongly recommend that the Bureau of Prisons designate the defendant to low security at FCI Fort Dix, New Jersey, for placement close to his family and to give him easier access to attorneys in Philadelphia who represent him in civil matters.

I have numerous letters from lawyers who need to have contact with him.

THE COURT:  That's fine.  I don't have any problem making that recommendation.

MR. McMAHON:  I can pass up what I have for --

THE COURT:  Sure.  And, of course, Mr. Mogilyansky, I'm sure, understands that that will be the decision by the Bureau of Prisons based on, of course, many factors, but I will be happy to recommend that.

I didn't mean to ignore you, Ms. Morgan-Kelly.  Do you have any objection to that request?

MS. MORGAN-KELLY:  No objection, Your Honor.  I just --

THE COURT:  All right.

MS. MORGAN-KELLY:  -- wanted to raise one other point with respect --

THE COURT:  Sure.

MS. MORGAN-KELLY:  -- to restitution.

I assume that the Court's order will indicate that that's payable immediately or within a specific amount of time, and will speak with Mr. McMahon and coordinate with Mr. Mogilyansky, given that the victims are overseas, that we can assure that the funds are --

MR. McMAHON:  As counsel and I have --

MS. MORGAN-KELLY:  -- delivered to them.

MR. McMAHON:  Counsel and I have discussed that, and we will work that out within a week.

THE COURT: Sure. I assumed that that -- that amount. So that amount of money. How about the fine? Is there any issue with respect to immediate payment?

Mr. McMahon.

MR. McMAHON: Within a week.

THE COURT: Within -- yeah, within a week. Okay. All right.

All right. Are there any other issues before I impose sentence or -- Mr. McMahon.

MR. McMAHON: Just one issue, Your Honor, and that is -- and maybe a unique issue, but it's -- we haven't had that much -- email.

THE COURT: What did you say, sir?

MR. McMAHON: Email.

THE COURT: Email.

MR. McMAHON: I want to make -- that the Court would -- prisoners now have the right to use email.

THE COURT: Oh, yeah.

MR. McMAHON: Okay. And which is very beneficial to the attorneys, also, and that -- that the Court, and I think -- I had talked to Ms. Morgan-Kelly about communicating with lawyers and family members, and she had no objection, all during incarceration. I would just ask that that non-objection --

THE COURT: Uh-huh.

MR. McMAHON:  -- continue on with the stipulations as already been determined.

THE COURT:  Well, my only hesitation, Mr. McMahon, usually if lawyers agree on something, I'm happy to -- to go with it, but I don't know what the rules are wherever he will be designated.  So I'm not quite sure --

MR. McMAHON:  I understand that.  That's --

THE COURT:  Do you mean until his designation?

MR. McMAHON:  Well, no.  I would say that a -- if you could just write in an order that the Court has no objection to him being accessible to email for his family and attorneys.

THE COURT:  Ms. Morgan-Kelly.

MS. MORGAN-KELLY:  Your Honor, we have no objection to that continuing.  Our only stipulation with counsel was that there be no contact, whether direct or indirect, with any victims or witnesses in this case.

MR. McMAHON:  Of course.

MS. MORGAN-KELLY:  And we would ask that to continue.

MR. McMAHON:  Of course.

THE COURT:  Sure.  I have no doubt that that -- yes. That, of course, should be a requirement.  All right.

Any other issues before I impose sentence?

MS. MORGAN-KELLY:  None from the Government, Your

Honor.

THE COURT:  Mr. McMahon.  Take a moment, sir.  Take your time.

MR. McMAHON:  No, Your Honor.  We're --

THE COURT:  Okay.  All right.

MR. McMAHON:  No.  I'm sorry.  No, Your Honor.

THE COURT:  No, that's -- I just want you to take your time if you need to --

MR. McMAHON:  No.

THE COURT:  All right.  If you rise, Mr. Mogilyansky, I will impose sentence.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, Andrew Mogilyansky, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 97 months as to Counts 1 through 4, all to run concurrently.

Upon release from imprisonment the defendant shall be placed on supervised release for a term of 15 years as to Counts 1 through 4.  Within 72 hours of release from the custody of the Bureau of Prisons the defendant shall report in person to the probation office in the district to which he is released.

Mr. Mogilyansky, while you're on supervised release, you shall not commit another federal, state or local crime.  You shall be prohibited from possessing a firearm or other

dangerous device.  You shall not possess an illegal controlled substance, and you shall comply with the other standard conditions that have been adopted by this Court.

Sir, you must submit to a drug test within 15 days of commenced of supervised release and at least two tests thereafter as determined by the probation officer.  I assume that will not be an issue, Mr. Mogilyansky, so that will then end your requirement of testing.

The following special conditions will also apply.

I don't think I raised this.  Mr. McMahon --

MR. McMAHON:  Yes.

THE COURT:  -- what are your thoughts on participation in a mental health program?

MR. McMAHON:  I don't see any need for it.  I don't --

THE COURT:  Don't see any need for it?

MR. McMAHON:  I personally don't, no, and I don't think Dr. Samuel has set nothing for treatment.

THE COURT:  Right.

MR. McMAHON:  I've dealt with him as much as anybody in the last nine months, and I see --

THE COURT:  I think this is --

MR. McMAHON:  I think that would be a waste of resources.

THE COURT:  I think -- I think what I will do,

though, is order that he shall be evaluated, and then if after the evaluation there is a judgment by the Probation Office that he should be in treatment, it comes to me.   In other words, it will be -- come to me as a recommendation --

MR. McMAHON:  Fine.  I understand.

THE COURT:  -- and then if you have any problem with it or object to it, I'll --

MR. McMAHON:  Okay.

THE COURT:  -- obviously consider that.

Sir, also, you shall follow the directions of the Probation Office regarding any contact with children of either sex under the age of 18, other than your own children, of course, and so, therefore, that will also impact employment or volunteer work which includes contact with minor children.

Sir, you shall register with the state sex offender registration agency in any state where you reside or are employed, carrying on a -- carry on a vocation or a student as directed by the Probation Office.

You shall cooperate in the collection of DNA as directed by the Probation Officer.

Sir, it is further ordered that you make restitution in the amount of $15,000.  That shall be -- that shall be due immediately, and as I take it, you're going to work together to get that to the victims.  All right.

I order that you pay a fine to the United States of

$12,500, and that shall be due within the week, and also, sir, you are to pay the United States a total special assessment of $400, which shall be due immediately.

You may be seated, Mr. Mogilyansky.

THE WITNESS:  Thank you.

THE COURT:  I will make the recommendation with respect to location that you've asked for, sir, and also -- Mr. McMahon, and also I'll put in the no objection to email.

Is there anything else before I tell Mr. Mogilyansky about the time for appeal?

Ms. Morgan-Kelly?

MS. MORGAN-KELLY:  No.  Thank you, Your Honor.

THE COURT:  Mr. McMahon.

MR. McMAHON:  No, Your Honor.

THE COURT:  Mr. Mogilyansky, if you want to appeal your conviction or sentence, sir, you must do so within ten days of today.  If you cannot afford an appeal, the clerk of court will file a notice for you.

Sir, I wish certainly you and your family the very best, but especially your wife and your children.

Thank you.  We're hereby adjourned.

MR. McMAHON:  Thank you, Your Honor.

MS. MORGAN-KELLY:  Thank you, Your Honor.

(Concluded at 1:02 p.m.)

* * * *

C E R T I F I C A T I O N

I, Tara Martin, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_Tara Martin_                    _3-21-12_

TARA MARTIN                      DATE

DIANA DOMAN TRANSCRIBING