# EXHIBIT T

# 2026 Evaluation Report

Steven Samuel, Ph.D.
9107 Clayton Road
St. Louis, MO 63124
Telephone: 215-909-0350
steven.samuel@jefferson.edu

Brian McMonagle, Esquire
1845 Walnut Street, 19th Floor
Philadelphia, PA 19103

May 19, 2026

**RE: Andrew Mogilyansky**

Mr. McMonagle:

I am writing to describe the results of Andrew Mogilyansky's psychological evaluation. In referring Mr. Mogilyansky for a psychological evaluation, as his privately retained attorney, you have sought my opinion regarding the presence or absence of psychological or psychosexual disorders or conditions in him and whether, as a psychologist and consultant to the Court, I can opine as to Mr. Mogilyansky's current estimated level of risk to the safety of the public, so that the Court could make a determination regarding an early termination of his supervised release.

**Materials Reviewed**

I have reviewed the following records prior to preparing this report:

1. **Court documents from the original proceedings in 2008-2009:**
   A. The Indictment in Case No. 08-711;
   B. The Plea Agreement dated March 13, 2009;
   C. The Pre-Sentencing Investigation Report, version dated July 21, 2009;
   D. My psychological evaluation report dated August 8, 2009;
   E. Transcripts of Mr. Mogilyansky's sentencing dated September 16, 2009.

2. **Joseph J. Peters Institute psychological evaluation and related records from 2016:**
   A. Post-Discharge Safety Plan dated August 15, 2016;
   B. Discharge Summary dated October 2, 2016;
   C. Change of Status Form dated October 2, 2016.

3. **Psychological evaluations and related records from 2017 related to USPO's petition to modify Mr. Mogilyansky's probation conditions (withdrawn by USPO):**
   A. USPO's petition dated September 15, 2017;
   B. Psychological evaluation report of Dr. Kalos (J.J.P.I) dated September 18, 2017;

1

    C. Polygraph Services LLC's report of polygraph examination and voice stress analysis, performed as part of my evaluation, dated November 10, 2017.
    D. My psychological evaluation report, dated November 17, 2017;
    E. Psychological counseling report of Dr. Seraydarian, dated December 4, 2017;
    F. USPO's withdrawal of petition, dated December 5, 2017.

4. **Motion of Andrew Mogilyansky for Early Release Termination of Supervised Release and 18 exhibits thereto, labeled A through R:**
    A. Counseling/Treatment summary report of Dr. Seraydarian, dated February 6, 2026;
    B. My letter summarizing my prior evaluations reports, dated February 9, 2026;
    C. J.J.P.I. discharge records, dated October 2, 2016 – same as 2.B. and 2.C. above;
    D. J.J.P.I. post-discharge safety plan dated August 15, 2016 – same as 2.A. above;
    E. Polygraph and VSA test reports dated November 10, 2017 – same as 3.C. above;
    F. Character reference letter of George Bochetto;
    G. Character reference letter of James Tupitza;
    H. Character reference letter of Gary Seitz;
    I. Character reference letter of Marina Kats;
    J. Character reference letter of Irina Vilk;
    K. Character reference letter of Dean Cafiero;
    L. Character reference letter of Yuri Lyubarsky;
    M. Character reference letter of Jane Doe, with cover from George Bochetto, Esq.;
    N. Character reference letter of Jonathan Weiss;
    O. Character reference letter of Steven Gelbart;
    P. Character reference letter of David Cooper;
    Q. Letter of Oksana Gluschuk, who is Mr. Andrew Mogilyansky's wife;
    R. Letter of Andrew Mogilyansky.

5. **Government's Opposition to Defendant's Motion for Early Termination of Supervised Release and two (2) exhibits thereto:**
    A. Dr. Kirk Heilbrun's Curriculum Vitae;
    B. Dr. Kirk Heilbrun's consultation letter to the Government, dated May 5, 2026.

**<u>Preliminary Statement</u>**

I reviewed the opinion letter of Dr. Kirk Heilbrun (item 5.B. above). For full disclosure, I have worked repeatedly with Dr. Heilbrun on multiple matters over many decades. I have great respect for him, and I believe he does for me as well.

Dr. Heilbrun correctly points out that items 4.A. (report from Dr. Seraydarian) and 4.B. (my letter summarizing prior reports) are not psychological evaluations. Dr. Heilbrun suggests that while all prior evaluators concluded that Mr. Mogilyansky's risk of reoffense was Low, the latest such evaluation was performed in 2017. Therefore, a current evaluation report would be useful. I agree

with Dr. Heilbrun on this point, and this evaluation report has been requested by Mr. Mogilyansky's counsel to address this issue.

Additionally, Dr. Heilbrun points out that my 2009 evaluation states that I did not have access to Mr. Mogilyansky's pre-sentencing investigation report (PSR) in my 2009 evaluation. Because of this, Dr. Heilbrun opines that I was unaware of Mr. Mogilyansky's involvement in the Berenika prostitution service. This is incorrect, and a result of presumed confusion on the part of Dr. Heilbrun. First, I was aware of this aspect of his criminal case, as it was contained in his 2008 indictment. Additionally, I also discussed this subject with Mr. Mogilyansky, his wife, and his counsel Jack McMahon, Esq. While the factual information I heard from them was generally consistent with that asserted by the prosecution, I was informed that there were some disagreements between the prosecution and defense regarding the extent of Mr. Mogilyansky's involvement and an appropriate way to describe it. It is my understanding that by agreement of the parties, the plea agreement expressly excluded any conclusions contained in the indictment regarding Mr. Mogilyansky's involvement. Nonetheless, I had multiple discussions with Mr. Mogilyansky, his wife and his counsel regarding this, and was informed of the facts and their qualifications as the government presented them. Furthermore, I did have access to Mr. Mogilyansky's *draft* pre-sentencing report at the time of my August 2009 evaluation, which was not finalized until the sentencing hearing on September 16, 2009. In retrospect, I probably should have clarified in the text of my 2009 evaluation that while I had no access to the *final* PSR, I did review its preliminary *draft* version among a multitude of other records.

In sum, I was quite aware of these facts, and Mr. Mogilyansky was candid with me in sharing the details of his involvement, such as a $10,000 loan he gave to Mr. Tarasov and a Ford Mondeo vehicle he provided and helped finance through a dealership customer of his in the automotive business. This said, these facts did not give rise to a separate count in Mr. Mogilyansky's indictment related to such misconduct, and I considered them to be less material to my evaluation than the grave charges for which he was actually indicted, and the risk of him reoffending along those lines. These charges of illicit sexual conduct in foreign places, and the risk of sexual reoffense by Mr. Mogilyansky, were my main focus during the evaluation.

Moreover, to the extent it was to become relevant, it was my opinion at the time that the risk of Mr. Mogilyansky's reoffending along the vectors of his unindicted [as a separate count] misconduct was virtually non-existent. It was quite clear to me that he was not ever again going to participate, financially or otherwise, in any illegal activity of this type. This was supported by his offense-free conduct in the nearly five years from February 2004 until his arrest in December 2008, and the general sense that whatever participation he did have to begin with, was not material enough to justify a separate count in the indictment. Since the plea agreement's factual stipulations excluded this topic, the PSR was still in draft form, my conclusion that the risk of any future misconduct along those lines was essentially zero in any case, and the focus of my evaluation being to determine whether Mr. Mogilyansky had any psychosexual disorders and to opine as to his risk of sexual reoffending, I did not feel it necessary to address these items.

This said, having considered all aspects of Mr. Mogilyansky's case in 2009, including those mentioned above, and with the primary focus on the crimes for which he was being convicted, I reached my conclusion that he was at Low Risk of reoffending across all dimensions of risk, and that he did not suffer from any psychosexual disorders. I then provided testimony at Mr. Mogilyansky's sentencing hearing, during which I was examined at length by Mr. Mogilyansky's attorney, and then cross-examined by Ms. Morgan on behalf of the Government for about the same period of time. Although Ms. Morgan was aware of the content of the final PSR, she did not ask me whether I knew about those aspects of the case. Had she done so, I would have confirmed my knowledge of these facts and provided my then-existing opinion, described above, by way of testimony. This opinion remains the same today, reinforced by 17 additional years of facts showing no misconduct, a multitude of additional evaluations consistent with my findings, successful reintegration into society, and new, robust decision-making processes established by Mr. Mogilyansky since his release.

Since the PSR was only finalized on the very day of the sentencing hearing (and contained the items pointed out by Mr. Heilbrun), and I was not asked about these items during my testimony by Ms. Morgan, I never got the chance to testify about Mr. Mogilyansky's risk associated with those issues. In the end, however, being aware of the items in the PSR and after my detailed testimony, the sentencing court credited and accepted my opinions regarding Mr. Mogilyansky's risk, as my review of the sentencing transcript shows. The sentencing court further opined that it accepted my findings, and stated on the record its conclusion that Mr. Mogilyansky was unlikely to commit another crime, and the public did not need to be protected from him.

Subsequent to my 2009 evaluation, the same conclusions about Low Risk and no psychosexual disorder diagnoses were reached by two J.J.P.I. psychologists who evaluated Mr. Mogilyansky after his release. Importantly, J.J.P.I psychologists had access to the final PSR at the time of their evaluations. The first J.J.P.I. evaluation, followed by six months of weekly counseling, was performed at USPO's direction in 2016, commencing shortly after Mr. Mogilyansky's release from prison. A polygraph test was administered at the end of that evaluation to ensure the integrity of the information shared by Mr. Mogilyansky with the psychologist. Mr. Mogilyansky was not informed during the 6-month period that he would have to undergo the polygraph test thereafter, which further bolsters the conclusive nature of that process. After six months of weekly meetings with Mr. Mogilyansky and performing the polygraph test at the end, the J.J.P.I. psychologist expressly stated in his Post-Discharge Safety Plan that he agreed with my 2009 conclusions of Low Risk across all dimensions and no psychosexual disorders, including not being attracted to minors. It is telling that the J.J.P.I. psychologist, who was appointed by the Court and/or Probation, had much more extensive access to Mr. Mogilyansky during six months' worth of weekly sessions than I did in 2009, interacted with Mr. Mogilyansky's probation officer who initiated the original referral, and was able to administer a surprise polygraph test at the end of the 6-month period, expressed the exact same conclusions as I did in 2009: **Low Risk**.

The second J.J.P.I. evaluation was performed at Mr. Mogilyansky's own request in 2017 by yet another psychologist, who also had access to the PSR and considered its contests. The conclusions were again the same: **Low Risk**, and no psychosexual disorders.

Finally, I reached the same **Low Risk** conclusion again when I re-evaluated Mr. Mogilyansky in 2017. My evaluation at that time included the use of both polygraph and voice stress analysis (VSA) tests to thoroughly ensure the integrity and candor of all the information with which Mr. Mogilyansky provided me. All tests came back conclusive, resulting in my ultimate determinations consistent with all prior evaluations by me and two other psychologists from J.J.P.I.

In total, therefore, there have been four (4) prior evaluations of Mr. Mogilyansky by three different psychologists, all reaching the same conclusions regarding his Low Risk of reoffense and no psychosexual disorder diagnoses[1].

Finally, acting on his own without any requirement to do so, Mr. Mogilyansky voluntarily engaged with regular counseling with Dr. Seraydarian from 2017 until present. Dr. Seraydarian is a well-respected psychologist who, in addition to his counseling practice, regularly performs evaluations for both prosecution and defense. While Dr. Seraydarian's detailed report of his 8.5 years of Mr. Mogilyansky's counseling is not an evaluation, it is probative to Mr. Mogilyansky's psychological state, to how Mr. Mogilyansky deals with his decision-making, whether such decision-making is risky or considered, and and whether he is capable of making the types of bad decisions which led to his criminal conviction.

I performed the present evaluation on the background of these four (4) prior evaluations, as well as Dr. Seraydarian's detailed treatment report, which I considered as part of the collateral evidence record containing a significant volume of third-party accounts from a multitude of other sources.

## Scope and Timing of Evaluation and Basis for Opinions

Mr. Mogilyansky was evaluated by me via Zoom and telephone from my St. Louis, Missouri, office on the following dates:

- May 8, 2026 – Telephone
- May 11, 2026 – Zoom
- May 14, 2026 – Zoom
- May 14, 2026 – Telephone
- May 15, 2026 – Telephone

---

[1] I note that the two 2017 evaluations were performed against the background of Mr. Mogilyansky's viewing legal pornography in 2017, which was not a violation of his supervised release conditions. Both the J.J.P.I psychologist and I concluded that this did niot change Mr. Mogilyansky's risk of reoffending from Low Risk, determined in 2009 and 2016.

- May 16, 2026 – Telephone
- May 18, 2026 – Zoom
- May 19, 2026 – Zoom

On each occasion, Mr. Mogilyansky was located at his offices, except for the May 16, 2026 telephone interview, when he was located at home. No other persons were present throughout my interactions with Mr. Mogilyansky.

As part of performing the evaluation, I have had access to a large volume of current and past evidence from many collateral sources, which are listed in the beginning of this report. The current records included Dr. Seraydarian's counseling report (item 4.A. above), eleven current character reference letters from non-relatives (items 4.F. through 4.P. above), and a letter from Mr. Mogilyansky's wife (item 4.Q. above). I have also reviewed the letter from Mr. Mogilyansky himself (item 4.R. above).

I have also considered multiple prior test results, particularly the AASI-3 (Abel Assessment of Sexual Interest - 3) test which Dr. Seraydarian administered on October 24, 2024, and the PAI (Personality Assessment Inventory) test, administered on November 14, 2024. I have requested and received copies of these test results. These results, which fell within normal parameters, are described in Dr. Seraydarian's report. Their results were consistent with the prior conclusions of three (3) psychologists including myself, who in their four (4) prior evaluations concluded that that Mr. Mogilyansky was not diagnosed with any psychosexual disorders and was at Low Risk of reoffending.

As part of my evaluation, I also administered the **STATIC-2002R** and the **Sexual Offender Risk Assessment Guide (SORAG)** to Mr. Mogilyansky.

**STATIC-2002R:**

The STATIC-2002R is an actuarial risk tool for evaluating the risk of sexual recidivism among adult males with a history of sexual offending. It assesses the likelihood of sexual recidivism as well as historical, theoretically meaningful characteristics presumed to be the cause of recidivism risk (persistence of sexual offending, deviant sexual interests, general criminality).

Risk assessment scales, including the STATIC-2002R, synthesize static variables empirically related to sex offense recidivism. An individual's STATIC-2002R score is organized into Risk Categories ranging from **Low** (-2 through 2), **Low-Moderate** (3, 4), **Moderate** (5, 6), **Moderate-high** (7, 8), and **High** (9+).

**Results: Mr. Mogilyansky's Total STATIC-2002R Score is Low.**

**SORAG**:

The SORAG is bundled with the Violence Risk Assessment Guide (VRAG). Like the VRAG, the SORAG is an actuarial tool that can be used to predict the risk of re-offending among sex

6

offenders. It has maintained its status, along with the VRAG, as one of the most commonly used risk assessment tools for predictive likelihood of sexual offense recidivism.

The SORAG includes a Psychopathy Checklist-Revised (PCL-R) score, which is used to calculate the total SORAG score. The PCL-R is used for diagnosing psychopathy in individuals for clinical, legal, or research purposes. Clinical research identifies that the SORAG demonstrates acceptable to good discriminative accuracy for general, violent, and sexual recidivism.

The SORAG considers both sexual and nonsexual violence risk factors. In doing so, it acknowledges that sexual offenders can also pose nonsexual threats. In practice, the SORAG contains a 14-item static actuarial scale, each with a weight based on predictive validity. Items on the scale contain information regarding childhood/adolescent history, conduct disorder symptoms, criminal history (violent and nonviolent), and sex offense history.

The SORAG considers both sexual and nonsexual violence risk factors. Accordingly, it acknowledges that sexual offenders can also pose nonsexual threats.

The SORAG contains a 14-item static actuarial scale, each with a weight based on predictive validity. Items on the scale contain information regarding childhood/adolescent history, conduct disorder symptoms, criminal history (violent and nonviolent), and sex offense history.

Items on the SORAG include the following: Lived with both biological parents to age 16 (except for death of parent); Elementary School Maladjustment; History of alcohol problems; Marital status (at the time of or prior to index offense); Criminal history score for nonviolent offenses; Criminal history score for violent offenses; Number of previous convictions for sexual offenses (pertains to convictions known from all available documentation to be sexual offenses prior to the index offense); History of sex offenses only against girls under 14 (including index offenses); Failure on prior conditional release (includes parole or probation violation or revocation, failure to comply, bail violation, and any new arrest while on conditional release); Age at index offense; diagnosed with any personality disorder.

The SORAG is scored as follows:
- -17 to +2 indicates an individual is at Low risk for re-offending
- + 3 to +19 indicates an individual is at Medium risk for re-offending
- + 20 to +34 indicates an individual is at High risk for re-offending

**Results: Mr. Mogilyansky's Total SORAG Score is <u>Low</u>.**

**<u>CONCLUSIONS</u>**

Based on the results of Mr. Mogilyansky's current re-evaluation, those conducted by his many previous evaluators, including this evaluator, the following can be stated within a reasonable degree of psychological certainty:

1. Mr. Mogilyansky's level of risk for sex offense recidivism is **Low**. This risk level is not an average or prevailing risk under different tests. It is the same, consistent finding under multiple testing algorithms, and has been previously, repeatedly determined to be the same by five (5) evaluations performed by three (3) psychologists, including myself, who have evaluated Mr. Mogilyansky throughout the last 17 years.

2. The same point of view is held by Mr. Mogilyansky's therapist, Dr. Seraydarian, although his opinion is rendered as part of counseling and not as part of an evaluation.

3. Mr. Mogilyansky's level of risk for any other criminal misconduct is **Low**.

4. Mr. Mogilyansky is not diagnosed with any psychosexual disorders[2].

5. Mr. Mogilyansky is also not diagnosed with any other psychological disorders[3].

---

[2] As part of my review of the government's response to Mr. Mogilyansky's motion, I note that Ms. Morgan is asking the question about how Mr. Mogilyansky controls his urges. While it is not my job to engage in advocacy, I would be remiss not to point out that **there are no urges for him to control**. Multiple psychologists, including one at J.J.P.I who performed an evaluation at the direction of the USPO, have **unanimously** concluded that Mr. Mogilyansky is not diagnosed with any psychosexual disorders, i.e., that **no such urges exist**. Furthermore, even if hypothetically these three psychologists including me were somehow all wrong in their five evaluations, and even if Mr. Mogilyansky's 23-year spotless track record since his crimes was not proof enough, it is clear from Mr. Seraydarian's report, from all the non-family member collateral sources, and from my own evaluations in 2017 and 2026, that since his release in 2015, Mr. Mogilyansky has developed an extremely robust system of appropriate, careful and lawful decision-making that avoids any criminal risks. This is clearly demonstrated by his track record.

[3] I note that the only time Mr. Mogilyansky was ever diagnosed with any psychological (not psychosexual) disorder was in 2017 by Dr. Kalos from J.J.P.I. She reached the diagnosis Narcissistic Personality Disorder (NPD) after a single interview with Mr. Mogilyansky, during which Mr. Mogilyansky described to her his newly formed company, LSS, which provided a comprehensive suite of services in the legal and accounting fields. As Mr. Mogilyansky had no formal training in these fields, without checking with any collateral sources, Dr. Kalos apparently concluded that Mr. Mogilyansky's description of his business could not possibly be true, and therefore Mr. Mogilyansky was self-aggrandizing and overstating his skills, a symptom of NPD. In reaching this diagnosis, Dr. Kalos also made clinical-diagnosis mistakes which are pointed out in Dr. Seraydarian's letter dated December 4, 2017. In fact, Mr. Mogilyansky's description of LSS to Dr. Kalos was accurate, as I verified during my 2017 interviews with collateral sources, and as a large number of current reference letters further confirm. Therefore, it is clear that Dr. Kalos's diagnosis of NPD was incorrect. It is also not a diagnosis reached by any other psychologists, including me, who are more familiar with Mr. Mogilyansky's circumstances and psychological profile. It should be further noted that despite her incorrect diagnosis, Dr. Kalos did not recommend any treatment and reached the same conclusion as all other psychologists that Mr. Mogilyansky's risk of reoffending was Low.

6. Because Mr. Mogilyansky is not diagnosed with any psychosexual disorders, he does not require sex offender mental health treatment. I note that this is the conclusion also reached by two J.J.P.I. psychologists in 2016 and then again in 2017. His progress and performance since then exemplifies that these psychologists were correct, as was I in 2009 and in 2017 in reaching the same similar prognosis and risk evaluation.

7. Mogilyansky is 55 years old. This is an additional risk mitigating factor. The diagram below makes clear the curvilinear relationship between his age and decreased estimated risk for sex offense recidivism.



8. Judge Mary A. McLaughlin stated during Mr. Mogilyansky's 2009 sentencing hearing that she was impressed with my testimony and accepted my findings. I testified and included in my 2009 evaluation report that Mr. Mogilyansky was not diagnosed with a psychological disorder and that he was at a Low Risk for sexual offense recidivism. Judge McLaughlin stated on the record that Mr. Mogilyansky's misconduct were in stark contrast to an otherwise exemplary life, and that while obviously nobody can predict the future with certainty, it was her belief that the public did not need to be protected from Mr. Mogilyansky in the future, and that she did not believe Mr. Mogilyansky would ever commit another crime again.

9. Mr. Mogilyansky voluntarily participated in mental health treatment with Dr. Seraydarian from 2017 to the present. Dr. Seraydarian concluded, based on 8.5 years of counseling as Mr. Mogilyansky's psychotherapist, that Mr. Mogilyansky's level of risk for sex offense

9

recidivism was "infinitesimal." I reiterate that this determination was reached by Dr. Seraydarian as part of his counseling with Mr. Mogilyansky, and not as part of a forensic evaluation. However, I consider this determination to be probative, particularly due to the extent of Dr. Seraydarian's knowledge of Mr. Mogilyansky over such an extended period of time, and since it is also essentially identical to that reached by multiple experts, including myself, in multiple forensic psychological evaluations.

10. Mr. Mogilyansky has completed approximately 10.5 years of his 15-year supervised release term without any violations. His conduct was fully compliant with all conditions of supervision. He has benefited from rehabilitative supervision, which has served its purpose well. It is my opinion that Mr. Mogilyansky no longer requires it. Moreover, it is my opinion that the stigmata associated with him remaining on supervised release could actually stunt his further growth at this stage, now that he has completely and successfully reintegrated into society.

11. No new charges have been brought against Mr. Mogilyansky in the United States of America or any other location subsequent to the 2008-2009 criminal proceedings, nor did he have any history of breaking the law prior to the 2009 matter.

12. Mr. Mogilyansky's 2009 criminal conviction related to crimes committed five (5) years prior, in December 2003 – January 2004. While he was not under supervision during approximately five (5) years prior to his arrest, Mr. Mogilyansky has not been accused of having committed any crimes during that period. Combined with his 10+ year track of compliant supervision, this further indicates that Mr. Mogilyansky will not commit crimes when he is not under supervision.

13. Mr. Mogilyansky is transparent about his conviction in his social and professional life. He shares this information at the outset of each business and personal relationship to ensure full transparency. Almost all collateral sources point out that this transparency impressed them and gave them respect of and confidence in Mr. Mogilyansky, rather than contempt.

14. Regarding employment and income stability, Mr. Mogilyansky has stable full-time employment through his company Litigation Support Services, LLC (LSS), a paralegal consultancy he founded shortly after his release in 2015, and as the Practice Manager and Senior Paralegal at the law firm of Tupitza & Associates, P.C. Multiple collateral sources have provided acclaim for Mr. Mogilyansky's competence, and the integrity with which he performs his services and work duties.

15. Regarding family, Mr. Mogilyansky has a robust family support structure that I have personally ascertained. His three children, who are aware of his conviction, were ages 7, 8 and 8 at the time of his release to home confinement in the fall of 2015. By all accounts, he has done a terrific job as a father raising them with his wife Oksana, and they are now successful young adults, enrolled in preeminent universities and excelling in their fields of study. While

10

Mr. Mogilyansky unbiased third-party reference letters in his submission to the Court, I have knowledge of ample collateral evidence to know that he has a strong family support network that extends far beyond his immediate family members.

16. Regarding social reintegration, multiple collateral sources reflect on close friendships Mr. Mogilyansky has established after his release with well-respected individuals and their families. This is particularly impressive given Mr. Mogilyansky's uniformly reported transparency about his conviction.

17. Regarding community involvement, multiple collateral sources point out multiple not-for-profit endeavors of Mr. Mogilyansky. He is clearly inclined to give back to the community and help those in need. Multiple collateral sources have pointed out Mr. Mogilyansky's high morals and personal qualities. Mr. Mogilyansky has also assisted formerly incarcerated individuals with their reintegration, both on his own initiative and as part of an Eastern District program, all with full support of Probation.

18. Regarding abiding by the law, Mr. Mogilyansky has consistently reflected on his respect for authority and the law. I know from both the present evaluation and my prior interactions with Mr. Mogilyansky that he is very much pro law enforcement, which in my experience is uncharacteristic for those convicted of crimes. He also repeatedly expressed his gratitude to Probation and their support of his personal and business growth, particularly their approval of his travel arrangements for business and with his family.

19. Mr. Mogilyansky is the Co-Founder and Chairman of the International Foundation for Terror Act Victims (IFTAV), a charity he founded in October 2002 which was highly commended by multiple witnesses during the 2009 sentencing hearing and credited by Judge McLaughlin in her remarks at the end of that hearing.

20. In sum, it is my opinion that Mr. Mogilyansky poses no danger to public safety.

Thank you for the opportunity to evaluate Mr. Mogilyansky. The opinions and conclusions expressed in his psychological evaluation report are stated within a reasonable degree of psychological certainty.

Sincerely yours,

/s/
Steven Samuel, Ph.D.

11